**Thomas L. GARDNER,**
**Appellee/Cross-Appellant,**

v.

**John W. MORRIS, Lieutenant General,**
**Chief of Engineers, Corps of Engineers,**
**Department of the Army, Appel-**
**lants/Cross-Appellees.**

**Walter C. Bell, Colonel, District**
**Engineer, Corps of Engineers,**
**Department of the Army.**

**Nos. 83–1458, 83–2011 and 83–2196.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 17, 1984.

Decided Jan. 14, 1985.

Rehearing Denied Feb. 15, 1985.

Jenny Sternbach, J.D., Washington, D.C., for appellants/cross-appellees.

Michael Hoare, St. Louis, Mo., for appellee/cross-appellant.

Before HEANEY, ROSS and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

The Army Corps of Engineers (the Corps) appeals from a final judgment entered in the District Court for the Eastern District of Missouri after a non-jury trial[1] granting Thomas L. Gardner monetary and injunctive relief for injuries sustained as a result of discrimination on the basis of his handicap in violation of the Rehabilitation Act of 1973, as amended in 1978, 29 U.S.C. § 701 *et seq.* (Rehabilitation Act or the Act), and the regulations promulgated thereunder. For reversal the Corps argues that the district court erred in finding that (1) Gardner properly exhausted his adminis-

---

1. The case was tried before a United States Magistrate by consent of the parties pursuant to 28 U.S.C. § 636(c)(3).

trative remedies pertaining to his 1981 and 1982 applications for overseas assignment and (2) the Corps could have safely and reasonably accommodated Gardner in Al Batin in 1978. For the reasons discussed below, we reverse the judgment of the district court.

FACTS [2]

Since October 1961, Gardner has been a civilian employee with the United States Army Corps of Engineers in St. Louis, Missouri. He began as a structural engineering draftsman, a GS–5 position, and has received numerous promotions. At the time of this lawsuit Gardner was classified as a civil engineering technician, a GS–11 level position, the maximum level that could be obtained in the St. Louis district.

In 1973 Gardner was diagnosed as a manic depressive. An individual suffering from this disorder can experience bi-polar episodes of the illness—mania and depression. During a manic episode a person exhibits euphoria, rapidity of thought and speech, hyperactivity, paranoia, impaired judgment, impaired social and work habits, hypersexuality, and a tendency to sleep less than normal. During a depressive episode a person experiences diminished motor capacity, sadness, crying, inability to sleep or excessive sleep, loss of interest, hopelessness, and thoughts of suicide. An individual afflicted with manic depressive syndrome may be unable to communicate his or her problems to others during an episode and may resist necessary medical attention.

Gardner has experienced only manic episodes, his first in 1973. His treatment requires a daily dosage of 1,800 milligrams [3] of lithium carbonate, a prescription drug that helps stabilize a chemical imbalance in his system. Lithium toxicity, which can be fatal, occurs when a patient gets a higher concentration of lithium in his blood stream than is desirable. To insure that the blood serum lithium levels are properly maintained, a blood sample must be drawn and tested every three to four months. The danger of lithium toxicity is heightened in warm climates because the concentration of lithium in the blood stream increases as salt and water are lost through increased perspiration. This problem can be combatted with an increased consumption of fluids and salt. Manic depressive episodes can occur even when a patient is stabilized on lithium, although the medication makes an episode less likely to occur.

The Corps has been involved in several major construction projects in Saudi Arabia since 1951. On April 18, 1977, Gardner applied for a position as a civil engineering technician in Saudi Arabia. In St. Louis Gardner was classified as a civil engineering technician at a GS–11 level, the maximum level attainable for that position in St. Louis at that time. An assignment to Saudi Arabia would provide Gardner with a promotion to a GS–12 level, a salary increase and an additional living allowance. His application for overseas assignment included the following question:

> Do you ... have any chronic or recurring physical or mental impairment or allergy which requires availability of general medical care, the services of a specialist, maintenance of prosthesis, medications, hospitalization, or special food? (This question is asked so that you will not be assigned where your special needs could not be met.)

In response, Gardner stated:

> I have been diagnosed as a Manic Depressive. The first and last manic episodes occurred in August and November 1973, respectively. I take 1,500 [milligrams] of Lithium Carbonate per day. No re-occurrence since I began taking Lithium in 1973. Laboratory blood work is required every 4 months to assure that the proper Lithium level is being maintained. After the doctor has seen the

---

**2.** We have substantially adopted the well-stated findings of fact contained in the magistrate's recommendation.

**3.** In his application for overseas assignment, Gardner mistakenly stated that he took 1,500 milligrams of lithium carbonate daily.

laboratory report, he writes new prescriptions to cover the next 4 month period. The daily amount of Lithium required has not changed since 1973.

On September 22, 1977, the Corps advised the St. Louis District Engineer that Gardner had been tentatively chosen for an overseas assignment to Saudi Arabia as a civil engineering technician. Gardner's tentative assignment was a brief tour in Riyadh, Saudi Arabia, with subsequent relocation to Al Batin, Saudi Arabia.

Corps personnel seeking assignments in Saudi Arabia in 1977 were required to undergo complete medical examinations and were evaluated according to the standards set forth in the Certificate of Medical Examination:

> Examining physician is advised that the medical facilities in Saudi Arabia are extremely limited with no capability for complicated medical situations. If employee or dependents have continuing/chronic illness or serious past medical history, qualification for assignment must be addressed carefully.

Dr. Ijaz Jatala, a board certified psychiatrist at the Sutter Clinic in St. Louis, Missouri, conducted Gardner's physical (not psychiatric) examination. At that time Gardner had not completed the portion of the certificate of medical examination which inquired whether he had a disorder that would interfere with his work duties. Apparently this omission was inadvertent. Furthermore, Dr. Jatala was not advised by Gardner or by anyone else that Gardner was a manic depressive or that he was on lithium. Based on the information that he had and his examination of Gardner, Dr. Jatala concluded that Gardner satisfied the Corps' medical requirements for the position in Saudi Arabia. Dr. Jatala indicated that he found nothing abnormal about Gardner's neurological and mental health. In October 1977, Gardner officially received the overseas position for which he had applied. On November 2, 1977, travel orders were issued—assignment to Riyadh with relocation to Al Batin.

The climate in Al Batin can be brutal with temperatures ranging from a low of 30° F on winter evenings to a high of 132° F on summer days. Typically, however, the average temperature on a summer day reaches 115° F with relatively low humidity. The constant blowing breeze occasionally develops into a sandstorm lasting three to four hours, during which all aircraft are grounded. In Riyadh the climate is dry but the temperatures are more extreme.

In December 1977, a clinic was maintained by a British support contractor at Al Batin. The clinic was staffed by a nurse and was designed to treat only ordinary maladies or traumas. There was no doctor at the clinic. Seriously ill persons would be stabilized until they could be moved to Riyadh or Dhahran. It was not until the spring of 1980, when a 100 bed hospital was opened in Al Batin, that there existed a facility in which blood analysis could be performed. Medical facilities available to Corps personnel in Riyadh in 1977 consisted of a clinic staffed by three physicians. In 1977 there were two hospitals in Riyadh available to Corps employees, but the hospitals did not meet western medical standards.

In 1977 it took one hour to fly or thirteen hours to drive from Al Batin to Riyadh. Radio communication between the two cities at that time was very poor. Each day communication was lost for approximately three to four hours. Evacuation to the nearest American MEDIVAC station in West Germany took between two to seven days depending on the communications, weather and availability of airplanes.

Gardner discussed the Saudi Arabia assignment privately with Dr. Ronald L. Martin, then Gardner's personal physician. Dr. Martin gave Gardner the names, but not the addresses, of two psychiatrists in Saudi Arabia with whom Gardner could consult. Both psychiatrists had completed their residency training at Washington University Medical School in St. Louis with Dr. Martin. Gardner was also given a six-month supply of lithium. Dr. Martin thought that the Saudi Arabia assignment was feasible

for Gardner if he remained under medical or psychiatric scrutiny.

On December 5, 1977, Gardner departed St. Louis for a three-day orientation session in Columbia, Maryland. Gardner had some difficulty locating the motel at which the orientation session was held. When he finally reached the motel, he became agitated, confused, and violent. The police were called to take him to St. Agnes Hospital in Baltimore, Maryland. He was diagnosed as suffering from an acute manic episode. Gardner was sedated for aggression, hostility and explosive behavior. He was transferred to Spring Grove Hospital Center in Baltimore, a state mental facility. During his week-long stay at the facility, Gardner was restless, hyperactive, and irritable despite sedation. His psychomotor activity was increased; he was unable to recall what had happened at the motel. Gardner was treated with lithium carbonate and thorazine. He was finally released from the mental hospital on December 12, 1977, and returned to St. Louis.

After his return to St. Louis, Gardner submitted a written report to the Corps explaining what had happened to him in Maryland. He stated that the incident in Maryland had been precipitated by poor information and directions, an upset stomach and a general lack of communication. He requested that his Saudi Arabia tour be completed and stated that the incident did not warrant cancellation of his assignment.

In January 1978, Gardner continued to inquire about future consideration for a Saudi Arabia assignment. Gardner was advised to obtain a written report from the doctor in Maryland about the Baltimore events and was told that he would have to be reexamined at the Sutter Clinic regarding his fitness for foreign duty. A reexamination to determine Gardner's "fitness for duty" in Saudi Arabia was arranged with Dr. Jatala. The reevaluation included (1) a review of the report of the treating physician at Baltimore, Maryland, during the 1977 episode, (2) a review of Gardner's own version of that episode, (3) a review of the letter from Gardner's personal physi-

cian covering the years 1976 to 1978, and (4) a psychiatric examination by Dr. Jatala.

Dr. Jatala's final report was based on paragraph 3 of the new Certificate of Medical Examination giving the following revised description of the requirements of the employment position sought:

Medical facilities in Saudi Arabia are extremely limited. The environment can be classified as hostile to those in the best of health and could be detrimental to those with any predisposing illnesses or chronic conditions. Examining physician is advised that there is no capability for complicated medical situations. If employee has continued/chronic illness or serious past medical history, qualifications for assignment to Saudi Arabia must be addressed carefully.

Pursuant to a "strict interpretation" of the above-quoted paragraph, it was Dr. Jatala's opinion that Gardner was unacceptable for assignment overseas. On April 19, 1978, Gardner was informed that his request for a permanent change of station to Saudi Arabia had been denied because he did not meet the physical requirements for the assignment.

Following the receipt of his rejection letter, Gardner submitted a written complaint of discrimination on August 3, 1978, to the Equal Employment Opportunity Officer for the Middle East Division of the Corps of Engineers. In a letter dated August 9, 1978, the Department of the Army denied his complaint on the ground that he did not satisfactorily meet the medical requirements for assignment in Saudi Arabia and thus had not raised the reviewable allegation of discrimination. Gardner filed an appeal within thirty days to the Civil Service Appeals Review Board. In December 1978, the appeal was transferred to the Equal Employment Opportunity Commission (EEOC). On March 19, 1980, the EEOC denied the appeal and issued its right to sue notice. Gardner has not filed subsequent EEOC complaints against the Corps. On April 18, 1980, Gardner commenced this action. In December 1980 the EEOC denied Gardner's request to reopen

the 1978 decision and advised Gardner that he had no further administrative remedies.

In addition to the position sought by Gardner in 1977, the Corps has had other positions available in Saudi Arabia for civil engineering technicians at the GS–12 level since that date. Gardner applied for a temporary duty assignment in Saudi Arabia in 1981, but he was not selected. Although the Corps gave no reason for Gardner's rejection, the district court found that Gardner was not selected because of his manic depressive condition.[4] Again in January 1982, Gardner applied for a similar position in Israel, but had not received a response from the Corps regarding this position at the time of trial. The district court likewise found that the Corps failed to act upon Gardner's application because of his medical condition.

At trial Gardner prevailed on his claim of discrimination on the basis of handicap, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* The Corps w₁ s ordered (1) to offer Gardner an engineering position at a GS–11, Step 9 level, (2) not to discriminate against Gardner in the future in violation of the Rehabilitation Act of 1973, and (3) to pay Gardner $64,107.39 plus interests in damages and costs.

*The Rehabilitation Act*

Gardner brought this action under §§ 501 and 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791(b), 794 (1982). In 1978, the Rehabilitation Act was amended to provide private causes of action to persons subjected to handicap discrimination by the federal government and its agencies. *Prewitt v. United States Postal Service,* 662 F.2d 292, 302 (5th Cir. 1981) (*Prewitt*). First, the 1978 amendment to § 504, 29 U.S.C. § 794, extended the Act's prohibition against handicap employment discrimination to include the employment activities of the federal government:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his [or her] handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

Section 501(b), 29 U.S.C. § 791(b), requires the federal government as an employer to develop and implement affirmative action plans on behalf of handicapped employees.[5]

Gardner claimed that the Corps violated §§ 501 and 504 by discriminating against him on three occasions: on April 19, 1978, when the Corps finally denied his 1977 request for overseas assignment to Saudi Arabia; in 1981, when the Corps rejected his application for a temporary duty assignment in Saudi Arabia; and in 1982, when the Corps failed to act upon his application for a temporary duty assignment in Israel. Although Gardner brought this action under §§ 501 and 504, we have considered carefully the scope of protection and the allocation of burdens under both sections and we conclude that the relief afforded a successful plaintiff under § 501 is equal to or greater than that provided under § 504. For this reason we will review Gardner's action as one alleging a violation of § 501,

---

**4.** In August 1979 Gardner had another manic episode while at work in St. Louis. Gardner's supervisor, alerted to Gardner's problem, immediately took him to Gardner's personal physician. Gardner was hospitalized for two weeks.

**5.** Section 501(b), 29 U.S.C. § 791(b), provides:
 Each department, agency, and instrumentality ... in the executive branch shall ... submit to the Civil Service Commission and to the Committee an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met. Such a plan shall be updated annually, and shall be reviewed annually and approved by the Commission, if the Commission determines, after consultation with the Committee, that such plan provides sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for handicapped individuals.

29 U.S.C. § 791. Both sections prohibit discrimination on the basis of handicap by the federal government. *See Shirey v. Devine,* 670 F.2d 1188, 1200–01 (D.C.Cir.1982) (§ 501 implicitly prohibits discrimination on the basis of an employee's handicap by the federal government). In addition, § 501 requires the federal government to act affirmatively in order to reasonably accommodate handicapped employees or applicants. By comparison it is unclear whether § 504 alone mandates affirmative action by a federal employer. *See Southeastern Community College v. Davis,* 442 U.S. 397, 410–11, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979); *Treadwell v. Alexander,* 707 F.2d 473, 477–78 (11th Cir.1983) *(Treadwell ).* Section 501 empowers the district court to award a full range of legal and equitable relief, including attorney fees. *See* Rehabilitation Act, §§ 501 and 505(a)(1), 29 U.S.C. §§ 791(b), 794a(a)(1). Therefore, we will review whether the district court properly considered Gardner's claims of discrimination under § 501 of the Rehabilitation Act.

*Exhaustion of Administrative Remedies*

The Corps argues that the district court erred in considering the Corps' treatment of Gardner's 1981 and 1982 applications for overseas assignment as discriminatory acts because Gardner failed to file administrative charges as required by the Rehabilitation Act. We agree.

 As a preliminary matter, we need to address briefly the retroactive application of the 1978 amendments of the Rehabilitation Act to Gardner's 1978 claim of discrimination. The effective date of the 1978 amendments was November 6, 1978. It is well settled, and the parties do not dispute, that §§ 501 and 505(a)(1),[6] 29 U.S.C. §§ 791 and 794a(a)(1), apply retroac-

tively to claims pending administratively at the time the 1978 amendments became effective. *See Shirey v. Devine,* 670 F.2d at 1197. There is no dispute that Gardner's 1978 claim of discrimination was pending administratively when the 1978 amendments became effective and that Gardner properly exhausted his administrative remedies pertaining to his 1978 discrimination claim. The district court properly considered Gardner's 1978 discrimination claim under §§ 501(b) and 505(a)(1) of the Rehabilitation Act, 29 U.S.C. §§ 791, 794a(a)(1).

As previously noted, the 1978 amendments to the Rehabilitation Act incorporated by reference the provisions of § 717 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16 (1982), as the exclusive vehicle for judicial remedy of claims of discrimination in federal employment. *See* 29 U.S.C. § 794a(a)(1)(1982); *Smith v. United States Postal Service,* 742 F.2d 257, 261 (6th Cir.1984). Section 717 of Title VII of the Civil Rights Act requires that federal personnel actions be free from any discrimination and provides a cause of action to persons whose discrimination claims have not been resolved satisfactorily by administrative procedures. Section 717 requires that the claimant exhaust administrative remedies before filing a § 717 discrimination claim in court. *See Prewitt,* 662 F.2d at 303. "Compliance with the administrative review apparatus provided by Title VII is a requisite for judicial review of a discrimination claim." *Ray v. Freeman,* 626 F.2d 439, 442 (5th Cir.1980) (citation omitted), *cert. denied,* 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 198 (1981); *see also Smith v. United States Postal Service,* 742 F.2d at 262; *Prewitt,* 662 F.2d at 303.

---

**6.** Section 505(a)(1), 29 U.S.C. § 794a(a)(1), provides:

The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964, including the application of sections 706(f) through 706(k), shall be available, with respect to any complaint under section 791 of his title, to any employee or applicant for employment aggrieved by the final disposition

of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary workplace accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

■ Gardner failed to seek administrative review of the 1981 and 1982 claims of discrimination. Gardner argues, however, that the Corps engaged in a "continuing pattern" of discrimination and thus exhaustion of each discriminatory act is unnecessary. The district court accepted this argument. *See Gardner v. Morris,* No. 80–525C(4), slip op. at 24–27 (E.D.Mo. Dec. 30, 1982). We hold that the district court inappropriately applied the theory of "continuing violation" to the facts of this case.

■ The Corps correctly notes that the "continuing violation" theory permits courts to consider alleged discriminatory acts occurring *prior* to the 180 day statute of limitations period for Title VII actions if the acts were part of a "continuing pattern" of discrimination. This theory effectively extends the filing periods in Title VII actions. The "continuing violation" theory finds support in the legislative history of the 1972 amendments to Title VII. The sponsors of the 1972 amendments expressly approved of "[e]xisting case law which has determined that certain types of violations are continuing in nature, thereby measuring the running of the required time period from the last occurrence of the discrimination and not from the first occurrence." *See Milton v. Weinberger,* 645 F.2d 1070, 1075 n. 14 (D.C.Cir.1981) (citation omitted). Typically the "continuing violation" theory is advanced in cases where a plaintiff failed to seek administrative review for allegedly discriminatory acts that *preceded* acts for which administrative review was sought. *See, e.g., United Air Lines, Inc. v. Evans,* 431 U.S. 553, 557–58, 97 S.Ct. 1885, 1888–89, 52 L.Ed.2d 571 (1977). Here, Gardner asked the district court to consider administratively unexhausted claims that followed, rather than preceded, the 1978 discriminatory act.

Gardner cites several cases in which the courts considered subsequent acts of discrimination even though separate administrative charges were not filed for these claims. *See Kirkland v. Buffalo Board of Education,* 622 F.2d 1066, 1068 (2d Cir. 1980); *Ramirez v. National Distillers and Chemical Corp.,* 586 F.2d 1315, 1320 (9th Cir.1978); *Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973). These cases differ significantly from the present case. These cases involve subsequent discriminatory acts that occurred *while the plaintiff's charge was pending before the EEOC,* not years after the EEOC investigation was completed as in Gardner's case. *See Oubichon v. North American Rockwell Corp.,* 482 F.2d at 571; *see also Curry v. United States Postal Service,* 583 F.Supp. 334, 339 (S.D.Ohio 1984).

■ Although the Corps' treatment of Gardner's 1981 and 1982 applications may be relevant as proof of discrimination with respect to the 1978 claim properly before the district court, *see United Air Lines, Inc. v. Evans,* 431 U.S. at 558, 97 S.Ct. at 1889; *Ray v. Freeman,* 626 F.2d at 442–43; *DeMedina v. Reinhardt,* 444 F.Supp. 573, 579 (D.D.C.1978), we hold that the district court should have dismissed Gardner's claims of discrimination based on his 1981 and 1982 applications because of his failure to exhaust administrative remedies.[7]

### Reasonable Accommodation

■ Once it has been established that (1) the employee has been denied employment

---

7. Gardner argues that the exhaustion requirements for discrimination claims based on § 504 of the Rehabilitation Act, 29 U.S.C. § 794, differ from those under § 501, 29 U.S.C. § 791, and thus his subsequent discrimination claims are cognizable under § 504. We agree with the Sixth Circuit's conclusion in *Smith v. United States Postal Serv.,* 742 F.2d 257, 262 (6th Cir. 1984):

Congress intended to require persons complaining of handicap discrimination in employment to exhaust administrative remedies before availing themselves of judicial remedies under the Rehabilitation Act. The 1978 amendments to the Act mandate exhaustion as a prerequisite to such claims, regardless of whether they are brought under section 501 or section 504. Congress has not enacted one set of principles excusing exhaustion in handicap cases and another set of principles requiring exhaustion in sex, race, national origin, and age discrimination cases.

*See also Prewitt v. United States Postal Serv.,* 662 F.2d 292, 304 (5th Cir.1981).

on the basis of his handicap and (2) the particular handicap would impair job performance unless job requirements are modified, the dispute focuses on whether the employer can reasonably accommodate the handicapped employee. That these preliminary issues have been answered affirmatively in the present case is undisputed. The Corps terminated Gardner's overseas assignment because of his health, and it asserts no other reason, such as poor job performance, for its action. Similarly, Gardner concedes that some type of accommodation must be made to insure his safety in Saudi Arabia.

■ Under § 501 of the Act, 29 U.S.C. § 791, the Corps has an affirmative duty "to structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." *Ryan v. Federal Deposit Insurance Corp.*, 565 F.2d 762, 763 (D.C.Cir.1977).

■ The legislative history of § 501, 29 U.S.C. § 791, demonstrates that Congress intended that the federal government be a model employer of the handicapped. *See* 29 C.F.R. § 1613.703 (1984).[8] As the Supreme Court noted in *Southeastern Community College v. Davis*, 442 U.S. at 410, 99 S.Ct. at 2369, § 501(b), 29 U.S.C. § 791(b), unlike § 504, 29 U.S.C. § 794, expressly requires federal employers to develop affirmative action programs on behalf of handicapped persons.

Section 501(b), 29 U.S.C. § 791(b), does not specifically describe the types of affirmative action programs that would comply with the statute, but it does require that affirmative action programs contain "sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for handicapped individuals." The Rehabilitation Act does not contemplate, however, that a federal employer will launch major restructuring of projects and facilities, disregarding the expense of this accommoda-

tion. The 1978 amendments explicitly permit courts to "take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy." 29 U.S.C. § 794a(a)(2) (1982).

The EEOC promulgated extensive regulations to guide federal employers in making reasonable accommodations for handicapped persons.

(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

29 C.F.R. § 1613.704 (1984).

■ After a plaintiff produces sufficient evidence to make at least a facial showing that reasonable accommodation is possible, *Treadwell*, 707 F.2d at 478, the regulations require that the federal employer bear the burden of proving inability to accommodate. 29 C.F.R. § 1613.704(a). *See Prewitt*, 662 F.2d at 308; *Bey v. Bolger*, 540 F.Supp. 910, 924–25 (E.D.Pa.1982). If the employer presents credible evidence that reasonable accommodation is not possible or would be unduly burdensome, then the plaintiff must produce evidence "concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Prewitt*, 662 F.2d at 308. In sum, the ultimate question

8. For a complete review of the legislative history of the 1978 amendments to the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (1982), see *Shirey v.*

*Devine,* 670 F.2d 1188 (D.C.Cir.1982); *Prewitt v. United States Postal Serv.,* 662 F.2d 292 (5th Cir.1981).

in an action against a federal employer under § 501 of the Rehabilitation Act, 29 U.S.C. § 791, is whether, with reasonable accommodation, a handicapped person "who meets all employment criteria except for the challenged discriminatory criterion 'can perform the essential functions of the position in question without endangering the health and safety of the individual or others.'" *Prewitt*, 662 F.2d at 310, *citing* 29 C.F.R. § 1613.702(f) (1984).

The Corps argues that the district court's conclusions concerning "reasonable accommodation" are inconsistent with its findings of fact. Specifically, the Corps argues that in view of the district court's findings concerning the available medical facilities in the cities to which Gardner was assigned for overseas duty in 1978, the Corps would have acted irresponsibly if it had permitted Gardner to complete his Saudi Arabia assignment because Gardner's medical condition jeopardized his own safety as well as that of his fellow workers. Alternatively, the Corps argues that to make the necessary accommodations suggested by the district court would unduly burden the Corps' projects in Al Batin.

 The Corps met its initial burden of proving that it could not reasonably accommodate Gardner in Al Batin in 1978. The Corps demonstrated that Al Batin's extreme climate, poor communication and transportation facilities, and inadequate medical facilities posed a threat to Gardner's health that could not be reasonably overcome. Gardner argued, however, that the Corps could have reasonably accommodated him in several ways. First, Gardner argued that a protocol, *i.e.*, a set of written instructions for an attending health care professional describing the step-by-step procedure for treating a given illness, could have been implemented in Al Batin in 1978. If Gardner suffered a manic incident, the protocol detailed the treatment necessary until he could be transported to the MEDI-

VAC facility in West Germany for more extensive treatment. Gardner also argued that the Corps could have reasonably accommodated him by assigning him to another, more cosmopolitan city in Saudi Arabia. We reject this argument. In 1977, when Gardner applied for the overseas assignment relevant to this case, he specifically requested assignment to Al Batin. Upon Gardner's return to St. Louis after his manic episode in Maryland, he requested permission to complete his original overseas assignment. The district court, accordingly, only made findings concerning the available medical facilities in Al Batin and Riyadh, the cities to which Gardner applied for assignment and was assigned. Therefore, we need only to consider whether the district court erred in finding that Gardner could have been reasonably accommodated in 1978 in Al Batin through implementation of a medical protocol.

 In reviewing the factual findings of the district court we are bound by the "clearly erroneous" standard of Fed.R. Civ.P. 52(a). *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). We find that the district court's conclusion that the protocol could be implemented is inconsistent with its findings of fact and, thus, we are left with the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We hold, therefore, that based on the district court's factual findings, the essential prerequisites for safely treating Gardner by way of a protocol did not exist in Al Batin in 1978, and the district court's finding that such a system could be implemented to reasonably accommodate Gardner is clearly erroneous.[9]

The district court considered the evidence concerning the medical facilities at Al Batin

**9.** Similarly, in *Bey v. Bolger*, 540 F.Supp. 910 (E.D.Pa.1982), a postal employee with a serious heart condition claimed that his handicap could be reasonably accommodated if he were assigned to "light duty" status. The court decided, however, that because of the Postal Service's working conditions, assignment to light duty status would not be enough to reasonably accommodate the employee's illness. *Id.* at 926.

in 1978 and concluded, in accordance with the testimony of Gardner's expert witness, that a medical protocol could be implemented to treat medical problems that Gardner might face in Saudi Arabia.

> [I]f a health care provider in Saudi Arabia reports by telephone to a psychiatrist the nature of [Gardner's] behavior and follows the psychiatrist's directions, [Gardner's] health would not be compromised. Since health care providers and communication with psychiatrists in the United States were available and lithium and thorazine (to control [Gardner's] hyperactivity) could readily be made available, [Gardner's] illness could be controlled.

*Gardner v. Morris*, No. 80–525C(4), slip op. at 31. The district court further was undisturbed by the absence of facilities in Al Batin to monitor Gardner's blood lithium levels, stating that the problem could be overcome by regularly transporting Gardner or samples of his blood to nearby medical facilities that have the proper diagnostic tools. *Id.* at 32.

The Corps argues that even if one accepts the district court's assessment of the medical facilities at Al Batin in 1977, it would have been impossible and irresponsible to have implemented the medical protocol suggested by Gardner's expert witness. We agree.

The district court found that in 1978 and for what would have been the duration of Gardner's assignment to Saudi Arabia the clinic in Al Batin was staffed only by a nurse and that no physician was available at the site. *Gardner v. Morris*, No. 80–525C(4), slip op. at 13. Gardner's expert witness repeatedly testified, however, that the medical protocol could be safely administered by a physician. The district court also found that there were no facilities in Al Batin at which blood analyses could be performed until 1980. *Id.* The first impor-

tant step in the treatment of a manic episode called for in the protocol is the analysis of Gardner's blood to determine its lithium level. This test result is needed immediately.[10] If the lithium level is below the toxic range, lithium could be used to stabilize Gardner's condition. However, to administer lithium without first discerning the existent level in Gardner's blood could lead to lithium toxicity, particularly, as the district court found, in Al Batin where the risk of lithium toxicity is increased by the extremely warm climate.

The protocol also requires that the attending physician have constant telephone communication with a trained psychiatrist for treatment advice during a manic episode. The district court made no findings regarding the availability of satisfactory telephone communication between cities in Saudi Arabia or between the United States and Al Batin. The district court did find, however, that radio communication from Al Batin in 1978 was poor and did not improve until a microwave radio was installed in 1979. *Id.* at 14. As we have stated, although the burden of proving inability to accommodate rests with the employer, Gardner cannot remain silent after the Corps has presented credible evidence that one of the protocol requisites—good outside communication—did not exist in 1978. *See Treadwell*, 707 F.2d at 478; *Prewitt*, 662 F.2d at 308. Gardner did not present any evidence demonstrating that satisfactory telephone communication was available in Al Batin in 1978.

Finally, in the event of a manic episode, Gardner's medical history indicates that it is likely that he will require hospitalization. The district court found that no hospital existed in Al Batin in 1978. The district court concluded that the Corps could have reasonably accommodated Gardner by transporting him to nearby medical facili-

---

**10.** Gardner argues that the blood sample could be sent to Riyadh for testing. The result of the tests must be obtained immediately at the onset of a manic episode. The district court found that in the best conditions it took 13 hours to drive from Al Batin to Riyadh. If there were no sandstorms and a plane was available, the flight between the two cities could be made in one hour. However, the possibility of these complications makes dependence on air travel too risky.

ties or to the MEDIVAC unit in West Germany. This conclusion, however, contradicts several findings of fact made by the district court.

First, the conclusion fails to consider the transportation problems in Al Batin in 1978. It takes thirteen hours to drive from Al Batin to the nearest hospital facility in Riyadh. Frequent dust storms would impede air transportation between Al Batin and Riyadh for as long as three days. John Petkewich, chief Corps personnel officer in Al Batin in 1978, testified that it would be foolhardy even to drive across the desert under such conditions.

Gardner's manic episodes are unpredictable. His behavior during a manic episode was characterized by the district court as hostile, aggressive and explosive. *Gardner v. Morris*, No. 80–525C(4), slip op. at 9. Even after sedation he remained "restless, hyperactive and irritable." *Id.* If transportation was not readily available on the day that Gardner experienced a manic episode, Gardner would pose a significant threat of danger not only to himself, but also to those responsible for caring for him. If transportation was available to Riyadh, it is still questionable whether transporting a violent, aggressive person over rugged terrain for thirteen hours or flying a self-admitted "poor flyer" in a plane would impose a reasonable risk of harm to Gardner.

Even if Gardner could be safely transported to Riyadh, the district court found that the available hospitals in Riyadh did not meet western standards. Gardner failed to rebut the Corps' evidence that the medical facilities in Riyadh were inadequate. Flights to the MEDIVAC unit in West Germany were available once every two weeks. It would have been unreasonable, irresponsible and unsafe to hospitalize Gardner in the substandard facilities available in Riyadh while he waited two weeks to be flown to West Germany.

Having decided that the district court erred in finding that the Corps could have implemented a medical protocol under the conditions as they existed in Al Batin in 1978, we need to decide what accommodations would have been necessary in 1978 to safely administer the protocol and whether those accommodations would have been reasonable.

In determining whether accommodation would impose an undue hardship on an agency's operations, the regulations promulgated under the Rehabilitation Act permit the court to consider

(1) [t]he overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.

29 C.F.R. § 1613.704(c) (1984).

There is very little decisional law construing what constitutes *reasonable* accommodation by the federal government. In *Treadwell* a man with a serious heart condition sought a position with the Army Corps of Engineers as a seasonal park technician. In order to have reasonably accommodated the applicant, the Corps would have had to require other park technicians to perform many of the applicant's duties. Because of the limited work force and the expansive area that the technicians had to patrol, the court agreed with the Corps that such " 'doubling up' would impose an 'undue hardship' " on the Corps. 707 F.2d at 478.

In *Prewitt*, the court stated that the Postal Service could have reasonably accommodated a person's inability to lift his left arm above his shoulder level simply by lowering the height of a mail shelf. 662 F.2d at 305.

In order to have safely implemented the medical protocol, at the very least the Corps would have had to hire a full-time physician and provide on-site blood testing facilities. Even these adjustments would not have taken into account the unreliability of communication and transportation facilities in Al Batin in 1978, and thus would not have assured that Gardner would have

been treated competently during a manic episode.

Certainly it would be unreasonable to require the Corps to construct a hospital to accommodate Gardner's handicap. Hiring a full-time physician and providing on-site laboratory facilities are also not the type of reasonable accommodations envisioned by Congress when it enacted the Rehabilitation Act. The cost of such accommodations in the early stages of a construction project would be unreasonable. Reasonable accommodations suggested in the federal regulations include work place modifications making it accessible to handicapped persons, work schedule adjustments, and acquisition of special equipment. 29 C.F.R. § 1613.704(b) (1984). Gardner failed to present any evidence that "reasonable" accommodations of that nature could have been made. The Corps on the other hand amply demonstrated that it tried to accommodate Gardner by continuing his employment in St. Louis where facilities are readily available to meet Gardner's special needs.

■ We emphasize the narrowness of this decision. We do not condone paternalism toward handicapped individuals. A person who can "perform the essentials of the job if afforded reasonable accommodation," *Treadwell*, 707 F.2d at 477, is entitled to an opportunity to perform that job. However, the ultimate test is whether, with or without reasonable accommodation, a handicapped person "can perform the essential functions of the position in question without endangering the health and safety of the individual or others." 29 C.F.R. § 1613.702(f) (1984); *see Prewitt*, 662 F.2d at 310. Gardner's illness could not have been reasonably and safely accommodated in Al Batin in 1977 and 1978. Gardner's hostile temperament during a manic episode also posed a danger to the safety of those working with Gardner because of the limited emergency treatment facilities in Al Batin in 1978.

In summary, we hold that the district court erred in failing to dismiss Gardner's discrimination claims based on his 1981 and 1982 applications because Gardner failed to exhaust his administrative remedies. We also hold that based on the district court's factual findings, the essential prerequisites for safely treating Gardner by way of a protocol did not exist in Al Batin in 1978, and the district court's finding that such a system could have been implemented to reasonably accommodate Gardner is clearly erroneous. Finally, we hold that the steps necessary to accommodate Gardner in Al Batin in 1978 would have unduly burdened the Corps. Accordingly, the judgment of the district court is reversed in its entirety.[11]

11. Because of the disposition of this case on the issue of liability, we need not address the issues raised on appeal and cross-appeal concerning the measure of damages and attorneys' fees.