William R. ADRAIN, Plaintiff,

v.

Lamar ALEXANDER, Secretary, Department of Education, Defendant.

Civ. A. No. 88–3581.

United States District Court, District of Columbia.

May 13, 1992.

St. John Barrett, Washington, D.C., for plaintiff.

Patricia D. Carter, Asst. U.S. Atty., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

### FINDINGS OF FACT

This is an employment discrimination case arising under the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794a. It was tried by the Court on February 25 and 26, 1992. In addition to plaintiff, a total of ten (10) witnesses testified with the same number appearing for each side. Upon the conclusion of trial, each party submitted findings of fact and conclusions of law.

*Background*

1. Plaintiff is a 59-year-old white male who has had quadriplegic cerebral palsy since birth, which limits his control of his hands, arms and legs. He uses a wheelchair and is physically unable to write legibly and his speech is difficult to understand.[1] Despite these severe physical handicaps, he graduated from high school in 1954, received a B.A. in Business Administration from American University in 1959, and a Master's Degree in Business Administration from American University in 1966.

2. Plaintiff has been employed by the Rehabilitation Services Administration (RSA) of the Department of Education (DOE) and its predecessor agency, the Department of Health, Education and Welfare (HEW), since 1969. RSA was the agency established by Congress to carry out, among other things, the Rehabilitation Act of 1973. RSA, in turn, is composed of at least three branches, including the Special Projects Branch, Basic State Grants Branch, and the Independent Living Branch. The mission of RSA is to develop and implement programs of vocational rehabilitation and independent living for persons with handicaps, to maximize their employability, independence, and integration into the work place and community. This agency, because of its purpose, is particularly sensitive to the problems of the handicapped.

3. Plaintiff was first employed in 1969 in a full-time, permanent position by the predecessor agency, HEW, as a GS-5. In 1977, he became a GS-9, in which grade he remains today, after 23 years with the DOE and its predecessor agencies. He has lived alone since 1986 and has no close living relatives.

*Contentions of the Parties*

4. Plaintiff claims that he would have been promoted to GS-11 long ago, but for the agency's failure to develop him professionally and to accommodate his handicap. He specifically points to the agency's failure to provide him with a full-time/writer assistant. He also claims that, entirely aside from the matter of promotion, he should have been provided with a full-time writer/assistant to accommodate his handicaps.

5. On February 14, 1986, plaintiff filed an Equal Employment Opportunity (EEO) complaint of discrimination with the agency alleging he was denied reasonable accommodation of his handicap, a performance appraisal for Fiscal Year 1986, and pro-

---

1. A more complete description of plaintiff's physical problems is set forth in a 1987 psychiatric report (Plaintiff's Ex. 14):

Physically, Mr. Adrain's major problems are his congenital cerebral palsy which involves his legs so severely that he is unable to walk, which significantly impairs his arms and hands (e.g. making writing slow and difficult), and which affects his speech intelligibil-ity. In addition, he has had ulcers of a painful, severe nature which have required several hospitalizations and a chronic obstructive pulmonary disease and bronchitis.

The same report found plaintiff's IQ to be in the superior (IQ 120–129) range and stated that "there is no evidence of mental illness or significant maladjustment."

motion to GS–11. He subsequently received a writer for four hours a day, and a current performance appraisal (GPAS) but no promotion.

6. On September 25, 1986, the EEO complaint was settled when the agency agreed to give plaintiff a 90-day trial period in which he was provided with an opportunity to demonstrate that he could perform at the GS–11 level. Despite the extensive assistance and counselling which plaintiff received during this period, he was unable to complete successfully the assignments given to him. As a consequence, he was denied a promotion to GS–11. When the agency would not reopen the EEO complaint, this litigation followed.

7. It is defendant's position that plaintiff has not been promoted because he has not performed adequately at his present GS–9 level and that providing a full-time writer/assistant would not have made a difference. In support of this position, defendant has presented evidence from four witnesses who were in the best position to judge plaintiff's performance. These were four RSA employees who supervised plaintiff in the 1970's and from 1981 through 1991. George Conn, the former Administrator of RSA (1981–1986) worked with plaintiff in 1973–1974, and has devoted his career to creating and implementing programs for the handicapped; Mark Shoob, Assistant Commissioner for Program Operations in RSA supervised plaintiff in 1981–1984 in the Basic State Grants Branch; John Eger of the Special Projects Branch supervised plaintiff in 1984–1986; and Deidre Davis of the Independent Living Branch supervised plaintiff in 1988–1991. Conn, Eger and Davis are no longer with the agency. Conn and Davis themselves have disabilities which confine them to wheelchairs. We give full credit to their testimony, despite evidence somewhat to the contrary presented by plaintiff principally through Fred C. Windbeck.[2] Wesley Geiger and Douglas Hilker also testified for plaintiff.

8. The thrust of the testimony of defendant's witnesses is that plaintiff's entire employment history shows a pattern of consistent behavior—losing interest in his work, taking extended breaks, and failing to produce acceptable work—which conduct goes back to the early 1970's when he worked in the RSA Office of Public Affairs handling correspondence and drafting articles for the newsletter. He continued to have a problem sticking to his job and working diligently in the 1980's. He required an inordinate amount of his supervisors' time in order to comprehend his assignments, and still could not always produce usable products. His supervisors also noted that he was often not at his work station and thus not available for consultation or assistance. These problems were not related to his physical handicap, because he continued to have a problem doing analytical work, producing quality work, and being able to transfer training and information from one task to another even when he had the services of a writer. In short, their criticism of plaintiff's performance related to the quality of plaintiff's performance rather than its quantity. Even with the benefit of a part-time writer since 1986, there is no evidence that the quality of his work improved.

9. While plaintiff's GPAS for the 1984–1988 period reflect that his supervisors rated him "Fully Successful," the record is clear that those grading plaintiff's performance were most sympathetic with plaintiff's physical problems and his sense of frustration and that they showed that sympathy in the grades awarded.[3] Many

2. Windbeck's supervisory experience with plaintiff was first in 1976 and his last in 1988. He summed up plaintiff's performance as follows:

[I]n the rush of getting jobs done, Bill was pulled off to the side. Bill was not allowed to become part of the main stream because he slowed things down. Not only was he difficult to understand, but he was not able to write down assignments. He would have to try to remember them. So, as a consequence, his full capability was never put to use. But every assignment that I can recall being involved with Bill directly, it was done professionally and it was done adequately.

3. Mr. Shoob refused to give plaintiff a rating lower than "fully successful" because he didn't want to make a case for firing him; Mr. Eger never gave anyone a rating lower than "fully

at the same time noted that plaintiff had problems understanding assignments and in completing them. For example, his GPAS from Mark Shoob for 1984 states that

> Specifically, there is a need for him to show more initiative in carrying out assignments. This means giving careful attention to correspondence he is replying to and preparing replies that are responsive to the incoming letter, including options available to the writer and where appropriate, referring the letter to the office or agency that can assist the writer ... When I point out what is to be contained in correspondence, or other written assignments he needs to pay closer attention to insure that the product is consistent with instructions. The same applies to corrections or changes I tell him are needed to drafts he gives me to review.

Plaintiff's GPAS from John Eger for 1986 notes that

> In spite of repeated instruction and supervisory assistance, Bill does not seem to be able to fully comprehend the nature of his assignment as it relates to the program ... Bill does not devote sufficient energy or manage his time when his writer is not here to complete assigned tasks in a reasonable amount of time. Further, he does not carefully review the accuracy of materials typed by his writer. As a result, materials contain an excessive number of typos, misspelling, etc.

On December 20, 1987, plaintiff's supervisor James Taylor, who was not a witness, wrote to John Eger:

> Bill's allegation that he has no work is not accurate. The major difficulty is that Bill has not displayed writing and analytical skills needed to prepare basic correspondence and project reports done by the Independent Living Branch. When Bill turns in an assignment, the product most often has to be edited and rewritten so many times before it is an

acceptable product that he becomes frustrated, as does his supervisor. Because many revisions of his work are necessary, we end up doing the job for him. Additionally, Bill tends to hurry through his assignments, rather than taking enough time to figure out what has to be done.

10. The evidence shows that, even when provided with a writer/assistant for half-time, plaintiff did not use his time or his writer as effectively as he could. The evidence also shows that providing plaintiff with a full-time writer/assistant would not have cured plaintiff's inadequate performance because his deficiencies are based on causes which have no relationship to the defendant's failure to provide a full-time writer/assistant.

11. The agency in many other ways tried to accommodate plaintiff. It attempted to find meaningful work that plaintiff could perform, both inside and outside the agency. It also attempted to accommodate plaintiff's handicap by providing as much secretarial assistance as possible[4] and by purchasing equipment that permitted him to produce written work. The agency purchased the "Autocom" machine which enabled him to write but its use was abandoned as it caused plaintiff severe back pain. In 1986 a writer was hired to help him four hours a day. The agency has continued to explore available technology, such as the use of dictaphone equipment, as well as voice-activated computers. The record shows that other agency employees with cerebral palsy were able to work productively with computers, and one has been promoted to the GS–14 level.

12. The evidence is clear that plaintiff has not shown that defendant has failed to provide reasonable accommodation for his undoubtedly serious physical handicaps. The agency has provided plaintiff with a writer/assistant for four hours a day since May 1986 but this has not improved his performance.

---

successful"; Ms. Davis gave him a "minimally satisfactory" rating.

4. During the early 1980's RSA's headquarters staff was decreased by 40–45%, which prevented hiring anyone as an assistant to a handicapped employee.

13. Finally, there is no evidence that plaintiff's performance merits a promotion. His supervisors have not found that he performs at a higher grade level, but rather have been reluctant to assign tasks to him because he doesn't complete them properly. With the limited exception of Windbeck, not one of those who supervised plaintiff feels that his work performance qualifies him for a promotion to GS-11.

## CONCLUSIONS OF LAW

1. This Court has personal and subject matter jurisdiction to determine this cause.

■ 2. In order to establish a case of handicap discrimination, a plaintiff must establish that he is a "qualified handicapped person." *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Such a person is defined in 29 C.F.R. § 1613.702:

... [W]ith respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who, depending upon the type of appointing authority being used: (1) meets the experience and/or education requirements (which may include passing a written test) of the position in question, or (2) meets the criteria for appointment under one of the special appointing authorities for handicapped persons.

A handicapped person who, with reasonable accommodation, is unable to perform the duties of a particular position is *not* a qualified person within the meaning of the Act.

3. The 1978 amendments to the Act make the enforcement apparatus of Title VII of the Civil Rights Act of 1964, as amended, available to victims of handicap discrimination. *See* 29 U.S.C. § 794a; *Shirey v. Devine*, 670 F.2d 1188, 1194 (D.C.Cir. 1982). The amendments also permit the district court to consider the reasonableness of the cost of any work place accommodation in fashioning remedies for violation of the Act. 29 U.S.C. § 794a(a)(1). Regulations promulgated to guide federal employers in making reasonable accommodation for handicapped persons provide that

(a) An agency shall make reasonable accommodations to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited to: (1) making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

29 C.F.R. § 1613.704.

4. The handicapped plaintiff who seeks but is denied a position bears the initial burden to make a *prima facie* showing that reasonable accommodation of his handicap is possible. In this instance, once plaintiff has shown that a person with his handicap can, with accommodation, perform the tasks of the GS-11 position he sought, the employer bears the burden of demonstrating either inability to accommodate or that such accommodation was in fact provided. *Carter v. Bennett*, 840 F.2d 63, 65-66 (D.C.Cir.1988). Then the burden shifts back to the plaintiff to rebut the employer's evidence. *Gardner v. Morris*, 752 F.2d 1271, 1280 (8th Cir.1985); *Treadwell v. Alexander*, 707 F.2d 473, 478 (11th Cir.1983); *Prewitt v. United States Postal Service*, 662 F.2d 292, 308 (5th Cir.1981).

5. Plaintiff here has not shown that he can perform at the GS-11 level or that it is the lack of accommodation, i.e., failure to provide a full-time writer/assistant which prevents him from so doing. The issue is not whether the government provided plaintiff with every accommodation he requested, because it is not obliged to do this. Rather, the inquiry is whether the agency made it possible for the plaintiff to perform his essential responsibilities. In the *Carter* case, it was not considered unreasonable

for the agency to provide a part-time reader to a blind employee. In this case, provision of a part-time writer has not resulted in improved performance and therefore there is no justification for attempting to provide additional accommodation.

■ 6. An agency is not required to lower its standards for handicapped employees or to give them "trial periods" in which to demonstrate their abilities to perform at higher grade levels, when the existing work assignments and supervision accomplish the same result. *See Bruegging v. Burke,* 696 F.Supp. 674, 676 (D.D.C. 1987) (handicapped employee with cerebral palsy not promoted to GS–11 because his overall performance and accuracy were deemed inferior to other applicants'), *cert. denied* 488 U.S. 1009, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989). Plaintiff's length of service does not justify a promotion because promotions to higher grades in the competitive federal service are based on performance, not tenure. *Id.* at 675.

7. The agency here went beyond the requirements of reasonable accommodation in providing plaintiff a trial period in which to demonstrate his ability to perform at a higher grade level. It also complied with the Act in providing plaintiff physical accommodation, a part-time writer-assistant and any technical equipment he could use.

8. The record shows that it was not the lack of accommodation that restricted plaintiff's career so much as his inability to follow through on assignments and apply the experience gained on one project to a different one. For example, in a memorandum to plaintiff dated January 12, 1987 he was told

Although you have been a member of RSA staff since 1977 and in your current assignment for over a year, you demonstrated little knowledge of the law, legislative history, regulations or policies ... When you did research and obtain[ed] copies of the law and related materials, you appeared unable to apply it to assignments ... You seem to try very hard to do exactly what is requested of you, but do not appear to think about what is behind the request ... [Your assignment

to develop an applications package] represents a cut and paste rote effort without reflecting an understanding of what the purpose of the task was ... You require more supervision than would be expected of a grade eleven.

Similarly, his annual appraisal for 1989–90 states as follows:

Mr. Adrain, however, still produced work which was of very poor quality and generally useless to the Branch. He was given opportunities to produce letters to consumers; after extensive training and re-writing, he produced several satisfactory letters. He was encouraged to use the same format for future letters. However, when given several letters to respond to in July, he was unable to produce cogent responses and reverted back to the style that had been unacceptable in the first part of the year.

9. We find that the performance problems reflected here are not related to a lack of accommodation, and therefore that the failure to provide a full-time writer is not the reason for the poor quality of plaintiff's work and is not the reason why he has not been promoted. Furthermore, the agency is required to provide "reasonable" accommodation that is not unduly burdensome to the agency.

10. The agency cannot afford and is not required to hire a full-time assistant for every handicapped employee regardless of the employee's level of productivity. It would be unreasonable to require the agency to hire a full-time person to work with a GS–9 employee who isn't performing at that grade level, when the failure to perform is not attributable to the lack of a full-time writer. As noted above, other employees with plaintiff's handicap have been accommodated with equipment (which plaintiff appears to resist) and have been promoted to higher grades.

11. Finally, there is no evidence that this defendant violated the Rehabilitation Act in any respect in its treatment of this employee.

Accordingly, judgment is entered for defendant and this case is dismissed with prejudice.