50 So.2d 780

**DEPARTMENT OF INDUSTRIAL RELA-TIONS v. MANN.**

**6 Div. 961.**

Court of Appeals of Alabama.
Oct. 31, 1950.

Rehearing Denied Nov. 21, 1950.

J. Eugene Foster and O. J. Goodwyn, of Montgomery, for appellant.

Lipscomb & Brobston and Jas. M. Hamrick, of Bessemer, for appellee.

HARWOOD, Judge.

Having exhausted her administrative remedies upon the Board of Appeals finding that she was disqualified for unemployment benefits this claimant perfected her appeal to the Circuit Court of Jefferson County, Bessemer Division.

Two issues were presented in the de novo trial of this cause in the circuit court, namely:

1. Did the appellant voluntarily leave her work without good cause connected with such work, and

2. Was appellant available for work within the meaning of the Alabama Unemployment Compensation Law during the time she was filing her weekly claims for benefits under such law?     .

After the trial below the lower court entered a judgment finding that the claimant, appellee here, did not leave her employment without good cause connected with her work, and was not disqualified for receiving benefits, and ordered the decision of the Board of Appeals set aside and a judgment entered for the claimant.

From this judgment the Director of the Department of Industrial Relations as an interested party, perfected an appeal to this court.

In the trial below the claimant, appellee here, testified that she first went to work for the Hill Grocery Company in 1943. Shortly thereafter she was transferred to a store of that company managed by Mr. D. F. Wesson. Four or five other persons were employed in the store.

Her relations with Mr. Wesson, prior to his departure for military service were "just fine," and she enjoyed the work.

Mr. . Wesson entered military service, and was away for about two years. During his absence the appellee served as manager of the store for some eighteen months.

Upon Mr. Wesson's return he was again made manager of. the store, the appellee alleges at her request.

From this time on, according to the appellee, the situation was no longer a pleasant one, though she tried to cooperate with him as manager.

When asked by her attorney as to what had occurred between her and Mr. Wesson in regard to her work she replied: "Well, I might say it was just a lot of little things. He would show he didn't like the things I did." Appellee further testified however that Mr. Wesson never at any time made any complaint about her work.

When asked to give examples of the things that occurred between them the appellee related that on one occasion, while Mr. Wesson was absent, she had opened the store safe for Mr. Hood, Superintendent of the Hill Grocery Company. The appellee then testified: "I don't know, but it seemed he disliked that very much." —"He never did say anything, but he was sarcastic; he never did mention a thing to me. He never did say I don't like what you did at all. It would have been better if he had."

The only other example appellee could give reflecting on Mr. Wesson's attitude toward her was that on another occasion she had asked Mr. Hood about a light over some scales and a cash register which she was required to use. Mr. Hood asked Mr. Wesson to install the light. According to appellee Mr. Wesson "was nice about it. But he said I was too old to see anything."

On a Saturday, which "wasn't too long" after the scale incident the appellee left her job, and did not return.

The next day, that is Sunday, she called Mr. Hood and made an appointment with him for Monday morning.

The appellee's account of her conversation with Mr. Hood on Monday morning was as follows: "Well, I just told him I didn't want to go back to that place. He said well, we don't want you to quit; I will find you another place. He didn't ask me to go back to that store that day or at any time. He said the job that he thought he would find me that week didn't materialize."

He further told her it would be all right if she stayed home a few days, but he thought he would call her that week.

The appellee remained at home, but received no call, and the next thing she received was a separation notice.

She made no effort thereafter to see Mr. Wesson or Mr. Hood, except that she saw Mr. Hood at the Employment Office and he told her he was still willing to find a job for her when there was an opening.

Mr. Hood did call her in October and she resumed employment with the Hill Grocery Company.

On cross examination the appellee testified that while she served as manager she received commissions as well as a salary, and upon Mr. Wesson's return she reverted to a straight salary. She denied that this played any part in her dissatisfaction.

When asked what she replied when Mr. Wesson told her she was too old to see the scales she testified: "I guess I laughed it off."

"Q. Couldn't it possibly be that he was joking with you, since you laughed it off? A. I don't think so."

As to her conversation with Mr. Hood the appellee testified on cross examination that she "just told Mr. Hood I wasn't at all satisfied; it wasn't pleasant there; I didn't want to go back," and that she would be willing to work any other place, and that after their conversation Mr. Hood knew she was not going back.

Appellee stated she remained home five weeks after her conversation with Mr. Hood. She thought she had seen Mr. Hood several times during that period, as she went to the Hill store every day, but she never did ask Mr. Hood during this time if he had obtained another job for her, as she thought he would call when he had one.

She did not apply for work at any other place during this time.

When asked by the attorney for the Department if she could not "put your finger on anything definite that Mr. Wesson did that caused you not to work?" the appellee replied: "Well, it was just unpleasant."

On redirect examination the appellee testified that before Mr. Wesson had gone into military service he was never displeased with the displays she would arrange in the store. After he returned he would sometimes like the displays, and sometimes he would not, and then would take the displays down. That was one of the unpleasant things.

Her counsel then asked her:

"Q. Any other things that you can recall now, or some things that you don't want to say, that constituted the unpleasantness? A. No; just a lot of little things.

"Q. Can you remember any others? A. No."

On re-cross examination she testified as follows:

"Q. Wouldn't you think it is a manager's duty to determine how the display is made? A. I certainly do."

For the defense Mr. Wesson testified that his relations with the appellee were pleasant, and she was a good employee. He was not aware when she left on Saturday that she was not returning to her work, as she said nothing to that effect to him. He had never discriminated between employees in the store, and had appellee come back she could have had her job. Mr. Wesson denied he had at any time told appellee she was getting too old to see.

Mr. Hood called as a witness for the defense testified that when the appellee had called him on Sunday and told him she felt she could not return to work on Monday he had questioned her concerning her reasons

for leaving. She stated that "things weren't as pleasant for her as they should be. That it seemed like Mr. Wesson resented things she did."

When appellee could not give Mr. Hood any definite happenings on which she based her complaint he had suggested that she return to her job Monday and he would talk to her. Appellee replied she did not feel like returning to the store, and Mr. Hood told her he had nothing more to say. She then requested the appointment to meet him at another store on Monday.

Mr. Hood stated that at this meeting he had told appellee that he hated to see her quit because she had made a good employee; that he had no other opening at present, but as soon as he could he would get her another place.

We have set out at some length all of the material facts developed below because in our opinion the lower court has misapplied the governing legal principles to the developed facts.

Paragraph B, Section 214, Title 26, Code of Alabama 1940, as amended is as follows:

"An individual shall be disqualified for benefits for total or partial unemployment: * * *

"B. If he has left his work voluntarily without good cause connected with such work."

The evidence shows without contradiction that appellee left her work voluntarily. We are therefore concerned only with the phrase "without good cause connected with such work."

There are no provisions in our Unemployment Compensation Law, Code 1940, Tit. 26, § 180 et seq., defining or indicating what constitutes "good cause" under the above code section. We must therefore conclude that the legislature meant a reasonable cause, one that is material and substantial as applied to a particular set of facts.

Analysis of the appellee's own testimony fails to disclose any substantial or reasonable cause for her quitting her job.

Although repeatedly requested by counsel on both sides to be specific in describing the alleged abuse of her by Mr. Wesson, the manager, she could detail only three instances.

She stated that on the occasion when she opened the store safe for Mr. Hood in the manager's absence that "I don't know, but it seemed he disliked that very much," though the manager never did mention a thing to her about the incident, he was sarcastic. Even under Mrs. Mann's version of this incident, she *did not know,* but it *seemed that* the manager disliked her acts.

As to the incident concerning her request for a light over the scales, Mrs. Mann stated that Mr. Wesson "was very nice about it," but remarked that she was getting too old to see. On cross examination when asked what she replied stated she laughed it off.

Frankly, we can read nothing more into this incident than a jocular byplay between two employees of long acquaintance whose relationship for a large part of the time had been pleasant.

The remaining incident related to the fact that if Mr. Wesson was sometimes displeased with display arrangements made be Mrs. Mann he would take them down. Even Mrs. Mann testified this was well within the prerogatives of a store manager.

Other than the above incidents testified to by Mrs. Mann, her only other cause for quitting was "just a lot of little things" on Mr. Wesson's part. Probatively this statement is of little value.

Human beings have not yet become perfect. When any group is thrown together in close association the characteristics of one tend to frequently irritate another. We think it common knowledge that petty irritations are an unescapable part of every day living. If they do not arise to a material and substantial degree, they must be borne. No work that we know of is conducted in an atmosphere of complete sweetness and light.

It is now too well understood to require citation that the Unemployment Compensation Law was enacted to relieve the consequences and vicissitudes of unavoidable and enforced unemployment which was

not brought about by the voluntary creation of the worker.

■ Unemployment Compensation must be limited to "involuntary unemployment," for certainly it was specifically not the intention of the legislature to provide benefits to persons who leave their employment without good cause connected therewith.

One of the factors to be considered in determining what is good cause for leaving one's job is the consistency of one's conduct with a reasonably evidenced intent and desire to work and be self supporting.

■ When the evidence indisputably shows that a claimant left his or her employment voluntarily, and seeks employment benefits, the burden is upon the claimant to show good cause, connected with such work, for leaving. Henderson v. Department of Industrial Relations, 252 Ala. 239, 40 So.2d 629.

In its most favorable light appellee's own testimony tends only to show working conditions which by common knowledge are usual and normal in that such conditions were accompanied by petty irritations. Customary working conditions are not a sufficient reason for quitting work.

In his argument appellee's able counsel urges the following, among other things, in support of the lower court's finding that appellee had good cause connected with her work quitting: "It may have been that the things done by her manager were trifling in nature, viewed from the attitude of the employer, and it may have seemed insignificant as far as the Department is concerned. On the other hand, where this woman was compelled to work in such an environment it may have had a very deleterious effect on her mental attitude, and either her grievances, real or imaginary, could have played on her mind to such an extent that her personality could have been entirely changed. I think that the court will agree that even the cases of smaller indignities on the sensitivities of the woman may have far reaching effects and may so affect her nervous system and mental attitude that she could become morose and unfit for any type of employment. Evident-

ly, the court below felt that the accumulations of trivial insults and distasteful attitude of this young manager was sufficient good cause for this claimant to leave her employment."

■ While agreeing with the possibility of the correctness of counsel's argument from a purely psychological standpoint, it yet remains that the standards that must be used by the law are the standards of reasonableness as applied to the average man or woman, and not to the super sensitive.

While such standard may furnish only a pickax and shovel as tools, whereas the delicate instruments of a surgeon, or the evanescent nuances of the psychologist might better serve in a particular case, yet this average standard is the only tool chest at hand in the present development of the law. Of necessity such standard must be applied.

We are clear to the conclusion therefore that the lower court erred in finding that the appellee's evidence was sufficient to meet her burden in showing that she quit her job for good cause connected with her work.

We think that the lower court further erred in finding from the evidence that appellee was available for work.

She herself testified that in her interview with Mr. Hood, he had requested that she not quit, but that he knew after further conversation on her part that she was not returning to her job. Mr. Hood, according to appellee then told her: "He would try to have me transferred, and questioned me about going to Central Park." Appellee then contented herself with remaining at home, awaiting a call from Mr. Hood. She did not show enough interest in securing a new job to even ask Hood about her prospects, although she states she saw him in a Hill store several times thereafter. Nor did she make any effort to secure employment from any other source. After several weeks she did register with the employment office. The appellee was not fettered by a family, and so far as the record discloses there was no single reason why she could not have sought work. Instead

she contented herself to remain idle because of a promise by Mr. Hood that if an opening developed in his organization he would call her. This future and uncertain contingency is no rational excuse for appellee's apathy toward securing work.

A claimant, in order to be eligible for unemployment benefits must be available for work. Section 213, subd. C, Title 26, Code of Alabama 1940.

In Department of Industrial Relations v. Tomlinson, 251 Ala. 144, 36 So.2d 496, the Supreme Court held that registration for work at an employment office in accordance with regulations is but one of several findings necessary to establish eligibility, among which are the further findings that claimant is able to work and that he is available for work, and further that "a claimant in order to show that he was 'available for work' during the time for which he seeks benefits must at least show that he acted in good faith and made a reasonable effort to secure suitable employment of a character which he is qualified to perform by past experience or training."

To like effect is the recent decision of this court in Department of Industrial Relations v. Wall, 34 Ala.App. 530, 41 So.2d 611, 614, from which we copy the following excerpts:

"During the period for which she claimed benefits, she did not apply to any person or firm for employment, although the proof showed that there were several textile manufacturers in the near vicinity to appellee's home.

" 'The (unemployment compensation) law does not contemplate that a job must seek out the man and coax him to come to work. It presupposes some effort on the part of the employee to secure work.' Canton Malleable Iron Co. v. Green, 75 Ohio App. 526, 62 N.E.2d 756, 759."

The claimant here contented herself with filing her claim, registering with and reporting to the unemployment office, and waiting for a call from Mr. Hood, which call was dependent on the future and uncertain contingency of an opening developing in the Hill stores.

Appellee herself testified she made no other effort to secure employment. This is incompatible, under our decisions, as a matter of law, with the concept of what constitutes a reasonable effort on the part of this appellee to secure suitable employment of a character which she was qualified to perform.

It being our conclusion that the lower court erred in its application of the law to undisputed facts, the rule that its judgment must have the effect of a verdict of a jury, and will not be disturbed unless the preponderance of the evidence against it is so decided as to clearly establish that it is wrong and unjust, is not applicable. Department of Industrial Relations v. Tomlinson, supra.

Reversed and remanded.