The **CITIZENS BANK OF SHELBYVILLE,** Missouri, a Missouri Corporation, Plaintiff-Respondent,

v.

INDUSTRIAL COMMISSION of Missouri, James J. Butler et al., as Members of the Industrial Commission, Sharon M. Bentley, and Division of Employment Security, Defendants-Appellants.

No. 32802.

St. Louis Court of Appeals.

Missouri.

May 21, 1968.

Arthur H. Bitter, Jefferson City, for appellant Div. of Empl. Security.

Frank J. Iuen, Jefferson City, for appellant Ind. Comm.

Clyde Burch, Bethel, for respondent.

CLEMENS, Commissioner.

This appeal concerns an employee's right to unemployment benefits under the Employment Security Law, Chapter 288, V.A.M.S. The claimant, Mrs. Sharon M. Bentley, quit her job with the Citizens Bank of Shelbyville. She applied for unemployment benefits, contending that although she had quit voluntarily it was for "good cause", attributable to the bank. If not for good cause, she is disqualified for benefits (§ 288.050, subd. 1[1]). The issue is whether the bank cashier's unsociable attitude toward the claimant constituted good cause for the claimant quitting her job.

After holding an evidentiary hearing the Division of Employment Security allowed Mrs. Bentley's claim on the ground she had quit work for good cause because she had been mistreated by the bank's cashier, Mrs. Gloria Hardy. On the bank's petition for review the Industrial Commission held Mrs. Bentley was eligible for benefits. But on the bank's appeal the circuit court ruled as a matter of law that the evidence did not support the award and remanded the case to the Industrial Commission. For reasons to be stated, we affirm the circuit court's denial of the award.

■■■ We first consider the statutory law governing Mrs. Bentley's right to unemployment benefits, and then look to the scope of appellate review. In § 288.020 the purpose of the Employment Security Law is stated to be "* * * for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." Section 288.050, subd. 1, provides: "* * * a claimant shall be disqualified * * * if * * * he has left his work voluntarily without good cause * * *." The converse of this, applied to Mrs. Bentley, is that she is qualified for benefits only if she left her employment for good cause. The burden of proof was hers to show the right to benefits. O'Dell v. Division of Employment Security, Mo., 376 S.W.2d 137[7]. Whether the favorable evidence establishes good cause is a question of law. Poggemoeller v. Industrial Commission, Mo.App., 371 S.W.2d 488[5]. In Buttinger v. Ely & Walker Dry Goods Co., Mo.App., 42 S.W.2d 982[3], a workmen's compensation case, we said, "The term 'good cause' has no fixed meaning, but must depend upon the circumstances of each case to be determined by the sound discretion of the court." (See, also, Wilson v. Morris, Mo., 369 S.W.2d 402[7].)

■■■ Decisions of the Industrial Commission on questions of law do not bind this court, but as to questions of fact our review is limited to ascertaining upon the whole record whether the Commission could have reasonably made its findings and reached its result considering the evidence most favorable to the award. Cumbustion Engineering, Inc., v. O'Connor, Mo.App., 395 S.W.2d 528[1]. We do not limit our view of the evidence to isolated facts; we look to all of claimant's evidence. McTurman v. Bell, Mo.App., 398 S.W.2d 465. In applying the statute to this

evidence we bear in mind that although § 288.020, subd. 2, requires a liberal construction of the Employment Security Law, the disqualifying provisions of § 288.050 must be strictly construed. Kroger Co. v. Industrial Commission, Mo.App., 314 S.W.2d 250[3]. In the light of these principles we now look to the evidence.

Some facts are undisputed: Mrs. Bentley was one of four clerical employees under the supervision of Mrs. Gloria Hardy, the bank's cashier. Mrs. Bentley had worked there a year, occasionally waiting on customers but mostly sorting, posting and filing checks. Mrs. Hardy considered her a satisfactory employee. A week before Mrs. Bentley's departure, Mrs. Hardy found that someone had made a serious mistake, posting three checks to the wrong account.

According to Mrs. Bentley: Mrs. Hardy told all the employees that erroneous posting was the worst mistake a bank could make, that posting checks called for concentration, and she wanted no more talking while doing that job. Mrs. Hardy added, "If it happens again, that's it." Mrs. Bentley acknowledged she had made mistakes before and this one could have been hers. She also admitted Mrs. Hardy did not single her out and the mistake was never mentioned again. Nonetheless, Mrs. Bentley testified: "Well, it upset me. I never been talked to like that before. * * * It hurt me. I was upset and I was crying, but I did my work, I went ahead with my work and I waited on customers too, and I did all the next week, and I didn't cry."

Mrs. Bentley testified that during the following week she did her work and treated everybody as usual, but Mrs. Hardy gave her "the cold treatment every morning": "Mrs. Hardy didn't speak to me, she didn't say anything to me unless she had to, unless it was something with work, and she would snap me off * * *." "She wouldn't even look up when I come in of a morning. She would go ahead with her work, and just speak to me when it had

something pertaining to the bank." Mrs. Bentley considered her working conditions that week were intolerable.

At the end of the week the bank's board chairman, Mr. W. C. Hewitt, came to the bank and talked privately with Mrs. Bentley. According to Mrs. Bentley, he complimented her on her work, wanted her to keep it up, and told her he had been talking with Mrs. Hardy about Mrs. Bentley's behavior and was trying to smooth over their differences. "He said he thought I better apologize to her because she didn't think I was treating her right." Mrs. Bentley said nothing to Mr. Hewitt about how she had treated Mrs. Hardy that week. After work Mrs. Bentley went to Mrs. Hardy's home and told her Mr. Hewitt had been in and said she should apologize. "I didn't feel I owed her an apology so I gave her my key." On both these occasions Mrs. Bentley cried.

On this testimony the Commission accepted the referee's findings of fact, set out here with our own parenthetical remarks and emphasis: Mrs. Hardy, the cashier, failed to speak to Mrs. Bentley when she came to work each morning. Mrs. Bentley's actions were not responsible for the *alleged* tense situation in the bank. (No finding that Mrs. Hardy was responsible for it.) *If* the alleged unpleasant situation existed it was the cashier's responsibility to attempt to settle it. (This is a value judgment—a personal conclusion rather than a finding of fact.) The bank's chairman, Mr. Hewitt, told Mrs. Bentley he believed she should apologize to the cashier for not speaking to her the previous week. On these findings of fact the referee and the Commission concluded that the cashier's treatment of Mrs. Bentley gave her good cause for voluntarily leaving her employment.

As said, whether the evidence established good cause is a question of law. The issue is whether the unfriendly relations between Mrs. Bentley and Mrs. Hardy, during the week in question, justified Mrs. Bentley

quitting her job for "good cause", within the meaning of the Employment Security Law.

■ The stated legislative purpose of the Employment Security Law recognizes the menace of "economic insecurity due to unemployment" and provides for funds "to be used for the benefit of persons unemployed through no fault of their own" (§ 288.020). The law excludes from benefits employees who leave their employment without good cause (§ 288.050, subd. 1[1]). We must interpret the words "good cause" by their plain and rational meaning in the light of the purpose of the Employment Security Law.

■ That legislative purpose is illustrated by three cases. Thus, the statutory word "unemployment" means "lack of employment." A. J. Meyer & Co. v. Unemployment Compensation Commission, 348 Mo. 147, 152 S.W.2d 184[5]. In Kilgore v. Industrial Commission, Mo.App., 337 S.W. 2d 91[2], 90 A.L.R.2d 825, the court held that benefits were allowable when the "pressure of circumstances compels termination by the employee." In Haynes v. Unemployment Compensation Commission, 353 Mo. 540, 183 S.W.2d 77, the court determined that the claimant did not meet the statutory qualification of "available for work" (§ 655, RSMo 1939). She quit factory work for valid health reasons and thereafter would accept only sales work, at which she was inexperienced. In denying unemployment benefits the court ruled that the statute must be construed in the light of the evil it seeks to remedy, and held that by so restricting her availability for employment she was not "available for work"; she was unemployed through her own fault. Although the Meyer, Kilgore and Haynes cases concerned dissimilar circumstances, they support the principle that even a liberal construction does not allow benefits for all unemployment but does so only to meet the legislative intent "to promote employment security" (§ 288.020, subd. 2).

■ From all this we hold that good cause for voluntary unemployment is limited to instances where the unemployment is caused by external pressures so compelling that a reasonably prudent person would be justified in giving up employment. (See cases collected at Par. 1975, Vol. 1B, CCH Unemployment Insurance Reporter.)

Two Missouri cases demonstrate what is meant by good cause for voluntary unemployment. In Bussmann Mfg. Co. v. Industrial Commission, Mo.App., 327 S.W.2d 487, the employee had been doing heavy machine work and quit on her doctor's advice that continued heavy work would endanger her health. We upheld the allowance of benefits on the ground she had voluntarily left her employment for good cause. By contrast, in Hart v. Industrial Commission, Mo.App., 234 S.W.2d 803, the employer reprimanded the claimant for alleged discourtesies to patrons and threatened to give him "two weeks' notice" unless he changed. The claimant quit on the spot. The court upheld the denial of benefits on the ground claimant was disqualified since he had left his job voluntarily without good cause.

We look to "good cause" cases from other states where the facts were closer to those of our own case.

In Electrical Reactance Corp. v. Unemployment Compensation Board of Review, 169 Pa.Super. 269, 82 A.2d 277, two clerical employees left work after "objectionable conditions had existed for a long period of time" and their supervisor finally "became abusive * * * arguing, cursing and swearing." In upholding unemployment benefits the court said: "To constitute good cause, the employes' leaving must be for 'adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith.' [Citing cases.] The circumstances here meet these tests. These claimants were not required to continue being subjected to unjust accusations, abusive conduct and profane language."

In Green v. Unemployment Compensation Board of Review, 174 Pa.Super. 286, 101 A.2d 119, the claimant had an argument over the way work was being done by an employee who followed claimant on a later shift. The argument progressed and the other man struck the claimant. Both were called to the superintendent's office and he asked them to "shake hands and make up." The other man was willing *but the claimant refused and quit work.* In denying compensation the court said: "The Board found that ill feeling had been developing between claimant and the other employe over a period of some time; that claimant did not suffer any injury as a result of being struck, only that 'his feelings were hurt'; that, when the superintendent attempted to settle the controversy, claimant refused and voluntarily quit his job; and that he could have continued in his employment without any undue hardship. * * * 'Even in matters connected with his employment there must be some limit to the legally approved list of "good causes" for quitting employment. The quitting must be for such a cause as would reasonably *motivate in* a similar situation the average able-bodied and qualified worker to give up his or her employment with its certain wage rewards in order to enter the ranks of the "compensated unemployed." An employee may contend that the character and habits of his fellow employees are *distasteful to him, * * * yet these and similar reasons cannot be legally accepted as a "good cause" for leaving one's employment.' "

In Cunningham v. Unemployment Compensation Board of Review, 193 Pa.Super. *172, 164 A.2d 29,* the court said: "The record in this case clearly reveals that the claimant 'resigned' his employment because he did not like his superior, Mr. Barrett. He testified as follows: 'In other words, * * * I just could not stand any more of Mr. Barrett for his domineering ways. Better than fight with the gentlemen or fight with anybody I just resigned from the position.' " The court held the claim-ant had not met his burden to show "a compelling and necessitous reason" to terminate his employment.

In Department of Industrial Relations v. Mann, 35 Ala.App. 505, 50 So.2d 780, the issue was whether the claimant voluntarily left her work with good cause. Her relationship with the store manager became unpleasant. She said: "He would show he didn't like the things I did. * * * he was sarcastic; * * * But he said I was too old to see anything." The court said the employee must have a "reasonable cause, one that is material and substantial." And added: "Human beings have not yet become perfect. When any group is *thrown together in close association* the characteristics of one tend to frequently irritate another. We think it common knowledge that petty irritations are an unescapable part of every day living. If they do not arise to a material and substantial degree, they must be borne. No work that we know of is conducted in an atmosphere of complete sweetness and light. * * * the standards that must be used by the law are the standards of reasonableness as applied to the average man or woman, and not to the super sensitive."

The core of Mrs. Bentley's complaint is that for a week Mrs. Hardy did not speak to her when she came to work in *the morning; that Mrs. Hardy spoke only* when it had something to do with work and then would "snap me off"; that in an effort to make peace, Mr. Hewitt suggested Mrs. Bentley apologize to Mrs. Hardy. That is not enough. A harmonious relationship with a supervisor helps to make an employee's work pleasant. But the Employment Security Law was designed to avoid the menace of economic insecurity, not to make work pleasant for employees. As said in the Mann case, supra, petty irritations are part of everyday living and no work is conducted in an atmosphere of complete sweetness and light. "The pursuit of the perfect, then, is the pursuit of sweetness and light"—Matthew Arnold.

We cannot say that the lack of cordiality at Mrs. Bentley's job constituted external pressure so compelling that a reasonably prudent person would be justified in giving up employment. So, Mrs. Bentley did not have good cause for quitting.

The judgment of the Circuit Court is affirmed.

PER CURIAM.

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, judgment is affirmed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.