**Billie Jo McALISTER, Petitioner–Appellant,**

v.

**MISSOURI DIVISION OF EMPLOYMENT SECURITY, and Labor and Industrial Relations Commission of Missouri, and Department of Health and Human Services, Respondents.**

No. WD 39001.

Missouri Court of Appeals, Western District.

March 1, 1988.

Jane E. Worley (argued), Candace M. Zierdt, Kansas City, for petitioner-appellant.

Sharon A. Willis (argued), Sandy Bowers, Jefferson City, for Missouri Div. of Employment Sec.

Catherine J. Barrie, Jefferson City, for Labor and Indus. Relations Com.

Before MANFORD, P.J., and NUGENT and GAITAN, JJ.

NUGENT, Judge.

Billie Jo McAlister appeals from the judgment of the Circuit Court of Clay County affirming the decision of the Labor and Industrial Relations Commission of Missouri which found him disqualified for unemployment compensation. He claims the commission erred by improperly interpreting and restricting the definition of "good cause" and that the decision was not based on competent and substantial evidence upon the whole record.

We reverse and remand with directions.

The factual history of the employment and termination are decisive; therefore, we pay particular attention to the claimant's unchallenged evidence. The record discloses the following facts:

On December 27, 1982, the United States Department of Health and Human Services, Social Security Administration, hired Billie Jo McAlister as a temporary, part-time employee. At that time, Ira Land, the district manager, had spoken with Mr. McAlister several times and knew that he was completely deaf. In fact, Mr. McAlister was hired in an excepted position because of his handicap.

Mr. McAlister can read the lips of one person at a time, but by lip-reading he can only understand about thirty to forty percent of what is said. Much of his instruction must be in writing, and for group communication he needs an interpreter. Mr. Land was also aware that Mr. McAlister had to be trained "from scratch" on the computer.

Petitioner's primary job was computer operation, inputting and coding data. He had six supervisors in his first month on the job, and because of conflicting instructions, he was unsure what he was supposed to do. The computer that he operated was a complicated machine that his supervisors did not know how to operate, so they themselves could not answer the questions that he had. During that first month he received about sixteen hours of training. On several occasions after that, he requested additional training, and on February 25, 1983, he sent a written request to Mr. Land specifically asking for more training with an instructor whom he had found particularly helpful. Nevertheless, no additional training was ever provided. When he requested training again on March 24, his supervisor at the time, Marilyn Holhouser, told him that he had already received training and that she did not wish to discuss the subject.

Mr. McAlister's duties included attending staff meetings, and Arlene Clark, an interpreter (signer), attended the first three or four meetings with him. Later Mr. Land told Mr. McAlister that he did not have to attend staff meetings, that a signer would not be present, and that he would be provided notes of the meetings. In February, however, Marilyn Holhouser directed him to resume attending staff meetings. He told her that he would not attend unless a signer was present, and when he did not attend the next meeting, he was reprimanded. He then filed a grievance.

On March 17 he met with Mr. Land to discuss his failure to attend the previous staff meeting. After that conference, Mr. McAlister attended staff meetings without a signer. Ms. Clark testified that fourteen to sixteen people were usually present at the meetings and talked in succession and among themselves. They were not advised to speak so that Mr. McAlister could see their faces or to speak slowly so that he could follow what they said. Since he had been told to sit at the front of the room, he often could not even see who was talking. He did, however, continue to receive notes.

On March 24 Mr. McAlister had a "performance appraisal meeting" with Marilyn Holhouser. He testified that he was accused of misplacing certain computer printouts but that he had been off work on the day they had been misfiled. He again requested more training. When Ms. Holhouser refused to discuss more training and continued talking about the "rejects," Mr. McAlister got up and left the meeting. Ms. Iola Riley, a union representative who was present, offered to go after him, but Ms. Holhouser said that the meeting was over. When Ms. Riley left, she saw Mr. McAlister putting his personal possessions in his bag and leaving the office. He did not return, and on March 25 he was terminated.

On May 29 Mr. McAlister filed a claim for unemployment benefits. When his claim was denied, he requested a hearing. At that hearing Mrs. Lovia Riding, an "employee relations specialist" for the Department of Health and Human Services, the employer, testified that Mr. McAlister had been hired in an excepted, non-competitive, position because of his deafness. She also stated that she knew the department was to make "reasonable accommodations" for

handicapped employees. She did not know what reasonable accommodations might be; she did not know what the department's regulations required; she did not know whether the *Handbook* published by the Office of Personnel Management was applicable to the department; and she did not, in fact, know anything of Mr. McAlister's case except what she had been told by his supervisors.

At the end of all the testimony, the appeals referee found that, because of his handicap, Mr. McAlister was more sensitive and more easily frustrated than the average reasonable worker and that three months was not enough time for him to know if he would succeed in his employment. The referee found no distinctions under the statutes or in the case law to allow for differences between the average worker and the handicapped worker. Because of that he found that the appeals tribunal was without the authority to apply the standards of the *Handbook*, which had been introduced into evidence, and that Mr. McAlister had voluntarily left his employment without good cause attributable to his work or employer. He also found that Mr. McAlister had been overpaid $105 for the week of June 4.

Mr. McAlister requested that the Labor and Industrial Relations Commission review the decisions of the appeals tribunal, but the commission denied his requests for review.

On January 4, 1984, Mr. McAlister filed a petition for review of the decision of the commission in the circuit court. His employer, the Department of Health and Human Services, did not enter an appearance, but the Missouri Labor and Industrial Relations Commission and its Division of Employment Security filed a joint answer. The parties submitted briefs, and on November 14, 1986, the court entered an order affirming the decision of the commission. Mr. McAlister filed a timely notice of appeal.

In reviewing a decision under the Missouri Employment Security Law, an appellate court is constrained by the statutory mandate that the "law is to be liberally construed to accomplish its purpose to promote employment security ... by providing for the payment of compensation to individuals in respect to their unemployment," § 288.020.2, and "that disqualifying provisions of the law are to be strictly construed against the disallowance of benefits...." *Missouri Division of Employment Security v. Labor and Industrial Relations Commission of Missouri,* 651 S.W.2d 145, 148 (Mo.1983) (en banc). Review is limited to ascertaining whether the commission made its findings based upon competent and substantial evidence upon the whole record. As to questions of law, the court is not bound by decisions of the commission, and whether the favorable evidence establishes good cause is a question of law. *Knapp v. Missouri Local Government Employees Retirement System,* 738 S.W. 2d 903, 912 (Mo.App.1987); *Jennings v. Labor and Industrial Relations Commission,* 579 S.W.2d 845, 847 (Mo.App.1979); *Belle State Bank v. Industrial Commission,* 547 S.W.2d 841, 844 (Mo.App.1977); *Citizens Bank of Shelbyville v. Industrial Commission,* 428 S.W.2d 895, 897 (Mo.App. 1968). Questions arising as to uncontroverted or conceded facts are questions of law finally determinable by the courts. *Kristanik v. Chevrolet Motor Co.,* 335 Mo. 60, 70 S.W.2d 890, 894 (1934); *Knapp v. Missouri Local Government Employees Retirement System, supra.*

Mr. McAlister had the burden of establishing that he left his employment with good cause attributable to his work or employer. *Stevinson v. Labor and Industrial Relations Commission of Missouri,* 654 S.W.2d 373, 374 (Mo.App.1983). Once he had made a prima facie case, the burden of going forward with evidence to show that he lacked good cause shifted to the employer. *Knapp, supra* at 912; *cf. Ellis v. State Department of Public Health and Welfare,* 365 Mo. 614, 285 S.W.2d 634, 640–41 (Mo.1955) (en banc).

■ Our analysis proceeds along two avenues of inquiry. The first is whether Mr. McAlister made his prima facie case establishing that he had good cause for leaving his job. "Good cause" contemplates a

cause reasonably sufficient to motivate the average able-bodied and qualified worker in a similar situation to terminate his or her employment. *Missouri Division of Employment Security v. Labor and Industrial Relations Commission of Missouri, supra; Jennings, supra*, at 848; *Belle State Bank, supra*, at 846. This definition of "good cause" applies to all workers. Whether the claimant has met his burden of proof poses a question of law, that is, whether his decision to quit was reasonable and in good faith. *Contractors Supply Company v. Labor and Industrial Relations Commission*, 614 S.W.2d 563, 564–65 (Mo.App.1981).

Our second avenue is to examine the federal statutes, regulations and guidelines applicable to handicapped workers. Mr. McAlister is a deaf person and was employed by the Department of Health and Human Services, a federal agency governed by federal law. He was hired under federal provisions for handicapped workers, including the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796i, the regulations issued by the Equal Employment Opportunity Commission, 29 C.F.R. § 1613.704, and the *Handbook of Selective Placement of Persons with Physical and Mental Handicaps and Federal Civil Service Employment*, Office of Personnel Management, December, 1981.

■ The evidence established the following facts: When Mr. McAlister first went to work, the department furnished him an interpreter to help him communicate with others and to attend staff meetings with him. After three or four meetings, however, the employer stopped furnishing the interpreter without explanation. At one point Mr. McAlister told Mr. Land, the district manager, that he had four bosses and did not know what he was supposed to do; he was confused by conflicting instructions. During his first month he had approximately sixteen hours of training on the computer; he made repeated requests for more training, but to no avail. The computer he worked on was a complicated device, one that even his supervisors did not know how to operate. For three

months Mr. McAlister was subjected to conflicting instructions, was required to sit in staff meetings without an interpreter to sign for him and, despite repeated requests, was denied additional training. Finally, after being accused of misfiling computer printouts on a day when he was not on duty, he walked out.

This evidence was uncontradicted. "An administrative agency may not arbitrarily disregard or ignore the testimony of a witness not shown to have been disbelieved by the agency and only if the agency makes a specific finding that the undisputed or unimpeached evidence is not entitled to credibility and is unworthy of belief may that evidence be disregarded." *Stevinson v. Labor and Industrial Relations Commission of Missouri, supra*, at 374–75. The testimony of the claimant in an unemployment compensation case is like that of any other witness in this respect. *Wilson v. Labor and Industrial Relations Commission*, 573 S.W.2d 118, 121 (Mo.App.1978).

The appeals referee in the present case found that Mr. McAlister, as a handicapped individual, was more sensitive and more readily frustrated than the average reasonable worker and that, since he had been on the job for only three months, he had not given himself enough time to see if he could succeed in his employment. The referee further found no distinction under the statutes or in case law to allow for differences between the average worker and the handicapped worker. Because he found no distinctions, he concluded that "[t]he Appeals Tribunal is without authority to take the liberal view of a more lenient standard toward the handicapped as suggested in the handbook presented in evidence."

■ The referee, however, failed to note the salient fact in Mr. McAlister's case—he was a federal employee, and federal law mandates accommodation of handicapped individuals. The United States Congress adopted the Rehabilitation Act of 1973 for the express purpose of developing "comprehensive and coordinated programs of vocational rehabilitation and independent living." 29 U.S.C. § 701. The Act provides that each department and agency of

the federal executive branch adopt an "affirmative action program plan for the hiring, placement, and advancement of handicapped individuals ..." and requires that such plans include the methods by which "the special needs of handicapped employees" are to be met. 29 U.S.C. § 791(b). Under that section, each federal department and agency has an affirmative duty to "ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." *Gardner v. Morris*, 752 F.2d 1271, 1280 (8th Cir.1985); *Ryan v. Federal Deposit Insurance Corp.*, 565 F.2d 762, 763 (D.C.Cir.1977).

The legislative history of § 791 shows that the Congress intended that the federal government should become a "model employer" of the handicapped. *Gardner v. Morris, supra.*

The Equal Employment Opportunity Commission, the enforcing agency for the Act, has promulgated administrative regulations to define the duties of federal employers to make reasonable accommodations for handicapped workers. The applicable EEOC regulation is 29 C.F.R. § 1613.704, which in pertinent part provides as follows:

(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

The handbook the referee alluded to is the *Handbook of Selective Placement of Persons with Physical and Mental Handicaps in Federal Civil Service Employment.* Office of Personnel Management,[1]

December, 1981. The handbook suggests, at 44, that present employees be used as interpreters and that when they are not expert enough, a professional interpreter be provided for conferences, meetings, and other situations necessitating rapid communication of detailed information. It also states that "non-discrimination regulations require that training programs be accessible to handicapped employees, including those who are deaf." *Id.*

Mr. McAlister is a handicapped worker, a fact known by his employer when he was hired. For a short period of time an interpreter accompanied him to staff meetings, but that practice was discontinued without explanation even though an interpreter was present in the building, willing and able to attend meetings with him. Mr. McAlister's loss of an interpreter was not his only problem. During the three-month period he was employed he had seven "bosses" and was being given conflicting instructions by as many as four different people at one time. This situation would undoubtedly be frustrating for a hearing person but even more so for a deaf person who had to depend on a sometimes unavailable signer, written communications, or lip-reading (that at best enabled him to understand no more than forty percent of what was being said by one person). Added to this were the refusals of Mr. McAlister's supervisors to provide more than sixteen hours of training, when they themselves stated he would have to be taught "from scratch" to handle a complicated computer process.

Under such circumstances, we are not surprised that Mr. McAlister abandoned further efforts to resolve the situation with his supervisors. Any reasonable person— hearing or deaf—might do so after similar attempts and frustrations. "To constitute good cause, the circumstances motivating an employee to voluntarily terminate employment must be real not imaginary, substantial not trifling, and reasonable not whimsical, and good faith is an essential element." *Belle State Bank, supra,* at 846.

---

1. Formerly the United States Civil Service Commission.

The record shows that the circumstances that moved Mr. McAlister to leave his job were real and substantial, not imaginary. According to Senate Report No. 93–318, in enacting the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796i. The Congress intended to be responsive to the needs of handicapped individuals and to help solve their unique problems in the work place. The Congress believed that too many individuals were being placed in workshop situations that proved to be employment dead ends. Instead, the Congress sought to move people into the competitive job market so that they might live more independent lives and so that family members who spent time caring for them might return to the job market, thus contributing to the tax base and raising the standard of living for their families. The Congress heard testimony about limited training options available and the great difficulty of finding employment, especially for the profoundly deaf who often have limited communicative abilities and some behavorial disorders. 1973 *U.S.Code Cong. & Admin.News.* 2076–2143.

As a federal employee, Mr. McAlister was entitled to the full benefit of the federal regulations relating to handicapped employees. 29 C.F.R. §§ 1613.701–1613.709 (1983). In accordance with those regulations, *The Handbook of Selective Placement, supra,* at 42–43, discusses reasonable accommodations to deaf employees—job modification, special equipment, interpreters, and sign language instructors for hearing employees. As far as interpreters are concerned, "[a]gencies have authority to assign interpreting duties to present employees, hire new personnel, or let contracts as needed." *Id.* at 43. Agency heads are authorized to employ or assign persons to provide interpreting services.

When the department failed to provide Mr. McAlister the kind of accommodation he was entitled to under the law, that is, a signer to help him communicate, he had good cause for leaving his employment. His proof of that fact made his prima facie case. Here, the claimant made more than a prima facie case. The respon-dents then had the burden of rebutting his evidence or of offering a reasonable explanation for refusing Mr. McAlister an interpreter. *Prewitt v. United States Postal Service,* 662 F.2d 292, 308 (5th Cir.1981). They did not do so; in fact, they made no real attempt to do so. Ms. Riding, an "employee relations specialist," testified for the employer that Mr. McAlister was hired because of his deafness. She knew that "reasonable accommodations" should be made for handicapped employees, but she did not even know whether the Department of Health and Human Services was bound by the *Handbook*'s policy. She knew only that the department was bound by its own regulations, but she did not know what those were. She also testified that she would not interpret the department's regulations to require an interpreter as a reasonable accommodation. The employer and the respondents have not only failed to rebut the plaintiff's case, they have actually reinforced it. If anything, Ms. Riding's testimony proved the department's indifference to its duty and to Mr. McAlister's rights as a handicapped worker.

The respondents cite several cases in support of their argument that Mr. McAlister did not have good cause for leaving his employment. None of the cases cited is applicable to the case at bar. The fact that Mr. McAlister was a federal employee, that he is protected by federal statutes and regulations designed to promote the hiring and retention of handicapped workers, and that those rules were ignored is dispositive.

Accordingly, we conclude that Mr. McAlister must be deemed to have voluntarily left his employment with good cause attributable to his employer.

We reverse and remand the case to the circuit court with directions to reverse the decision of the Labor and Industrial Relations Commission and to remand the case to the Division of Employment Security with directions to award Mr. McAlister all benefits to which he became entitled under the law following his leaving his employment and the filing of his application for benefits on May 29, 1983, plus all benefits

that he may since have become entitled to receive under the applicable laws.

All concur.