Susan WOODARD, Appellant,

v.

HUDSON FOODS, INC. and Division of Employment Security, Respondents.

No. 21500.

Missouri Court of Appeals, Southern District, Division One.

Sept. 15, 1997.

No appearance for respondent, Hudson Foods, Inc.

Ninion S. Riley, Cynthia Quetsch, Jefferson City, for respondent, Division of Employment Security.

CROW, Judge.

Susan Woodard ("Claimant") sought benefits under the Missouri Employment Security Law, chapter 288, RSMo 1994, as amended.

Claimant's immediate past employer, Hudson Foods, Inc. ("Hudson"), protested the claim, averring Claimant "quit without notice."

A deputy of the Division of Employment Security ("Division") ruled Claimant was disqualified because she left work "voluntarily without good cause attributable to her work or employer." The deputy based the ruling on § 288.050, RSMo Cum.Supp.1996, which reads, in pertinent part:

"1. Notwithstanding the other provisions of this law, a claimant shall be disqualified for waiting week credit or benefits until after the claimant has earned wages for work insured pursuant to the unemployment compensation laws of any state equal to ten times the claimant's weekly benefit amount if the deputy finds:

(1) That the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer. . . ."

Claimant appealed the deputy's ruling to an Appeals Tribunal of Division. Following an evidentiary hearing, the Tribunal held Claimant voluntarily left her work July 16, 1996, without good cause attributable to the work or Hudson. Consequently, the Tribunal held Claimant was "disqualified for benefits until she has earned wages in insured work after July 16, 1996, equal to ten times her weekly benefit amount."

Claimant thereupon made application for review by The Labor and Industrial Relations Commission ("Commission"). The application argued that Claimant was afflicted with "episodes of stress and anxiety," hence she was "unable to continue working" in the department to which she was assigned. However, averred the application, there were openings in another department to which Hudson could have transferred Claimant. The application maintained that inasmuch as Hudson did not transfer Claimant, her evidence "met the burden of proving medical causation for her reasons to discontinue employment at Hudson Foods."

Commission, in a two-to-one decision,[1] held the decision of the Tribunal "should be affirmed because it is fully supported by the competent and substantial evidence on the whole record and it is in accordance with the relevant provisions of the Missouri Employment Security Law." The two-member majority adopted the decision of the Tribunal as the decision of Commission.

Claimant brings this appeal from Commission's decision. Claimant's sole point relied on reads:

"The Commission's determination was not based on sufficient, competent evidence in the record, because [the Tribunal] arbitrarily ignored relevant evidence not shown to be disbelieved or non-credible, that is the [Claimant's] medical evidence proving she was unable to return to work in the marination line because of panic disorders and therefore [Claimant] did not leave work without reasonable cause or justification."

We glean from the point that Claimant maintains in this appeal—as she did in her application to Commission for review of the Tribunal's decision—that although she left her work at Hudson, she had good cause attributable to her work or Hudson for doing so, consequently § 288.050.1(1), quoted *supra*, does not disqualify her from employment security benefits.

■ This court's authority to review Commission's decision is conferred by § 288.210, RSMo Supp.1995.[2] This court reviews the decision of Commission, not that of the Tri-

---

1. The record shows the dissident member of Commission as "dissenting without opinion."

2. Section 288.210, RSMo Supp.1995, provides, in pertinent part: " . . . after a decision of the commission has become final . . . any party aggrieved by such decision may appeal the decision to the appellate court having jurisdiction in the area where the claimant . . . reside[s]. . . . The commission shall notify the division [of employment security] of the commencement of the appeal, and . . . the division shall be a party to any judicial action involving any such decision. . . . Upon appeal no additional evidence shall be heard. The findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law. The court, on appeal, may modify, reverse, remand for rehearing, or set aside the decision of the commission on the following grounds and no other: . . . (3) That the facts found by the commission do not support the award; or (4) That there was no sufficient competent evidence in the record to warrant the making of the award."

bunal. *Cf. Burns v. Labor & Industrial Relations Commission,* 845 S.W.2d 553, 554[1] (Mo. banc 1993); *England v. Regan Marketing, Inc.,* 939 S.W.2d 62, 65[4] (Mo. App. S.D.1997). This opinion refers to the Tribunal's decision only because it was adopted by Commission.

The record shows Hudson hired Claimant November 1, 1995. Claimant worked "in the marination line in the cook plant."

At the Tribunal's hearing, Claimant testified she began having "panic attacks" at home in February, 1996. In March, 1996, she began having them at work. Asked to describe the attacks, Claimant replied: "I would start shaking and I'd get pains in my head and in my neck. I would start crying. I couldn't quit crying and I'd just keep shaking and ... I would have to leave the line because I was unable to perform my job."

Claimant recounted that in late March or early April, 1996, while at work, a co-worker became angry at her and grabbed her. This brought on a panic attack; Claimant had to "leave work that night."

Claimant explained that the co-worker was fired; however, Claimant's fellow employees got mad at Claimant because of the firing. Consequently, according to Claimant, after this incident her panic attacks "became more frequent and slightly more severe due to pressures."

Claimant testified Hudson granted her a two-week "leave of absence" on May 1, 1996. At that time, said Claimant, she filled out a "transfer slip" seeking assignment to the sanitation department. Claimant narrated: "I couldn't [remain where I was assigned] because the ladies ... felt that it was my fault because [the co-worker] got fired and so they started treating me pretty poorly, cussing me and ... calling me names and not talking to me."

During her leave of absence, Claimant sought treatment from Kenneth G. Kallenbach, a medical doctor and staff psychiatrist of a physicians' clinic.

Claimant testified she remained emotionally unable to return to work on the marination line; consequently, Hudson granted her additional successive two-week leaves of absence.

An entry in Dr. Kallenbach's records dated June 5, 1996, reads, *inter alia:*

"Susan ... was very emotionally distressed and tearful.... She explained that she is feeling 'trapped at work and trapped in a relationship.' ... She complained of feeling hopeless and helpless....
ASSESSMENT: Panic disorder with agoraphobia[3] and major depression."

Claimant avowed that around this time (early June, 1996), she went to Hudson's plant manager, Mark Avery, and explained why she wanted to transfer to the sanitation department. According to Claimant, Avery told her that if she brought him a letter from her doctor stating that "medically" it would be better for her to transfer, he (Avery) would transfer her. Claimant told Kallenbach about her conversation with Avery.

Kallenbach wrote Avery a letter dated June 14, 1996. It reads, *inter alia:*

"I have been requested to write this letter to you concerning your employee and my patient, Susan Woodard.... As you know, she has been on medical leave of absence for quite some time. I think that it would be in Susan's best interest to be transferred to a different department that might decrease the amount of stress that she is experiencing.
I believe that Susan has an anxiety disorder. I think it is important for her to decrease stress in her life at this time. She informed me that she might have the opportunity to work in the sanitation department, and I think that would be a suitable transfer.... I believe that the most important thing for Susan is to not be under so much stress."

Claimant testified she talked to Avery after he received Kallenbach's letter. According to Claimant, Avery understood the letter as meaning Claimant could return to work on the marination line and remain there until a

---

3. We learn from Webster's Third New International Dictionary (Merriam–Webster Inc.1986) that agoraphobia is "abnormal fear of crossing or of being in the midst of open spaces."

position became open in the sanitation department.

Claimant felt it was impossible for her to return to work on the marination line, so she asked for, and received, additional successive two-week leaves of absence. However, the final one expired July 15, 1996.

Claimant recounted that on July 16, 1996, she called Hudson and talked to her supervisor, Kevin Grubbs. Claimant told Grubbs she "was probably going to quit because they weren't going to transfer [her]."

Claimant then called the "insurance lady" at Hudson; Claimant told the lady she (Claimant) would "probably be quitting." Claimant's purpose in calling was to find out "how the insurance worked" and how long she would be covered.[4]

Claimant avowed that the following day (July 17, 1996), she learned that while she was on leave, two workers had been transferred to the sanitation department. According to Claimant, she called Grubbs (her supervisor) and asked "if he had filled out the paperwork" for her "dismissal or ... termination or whatever they wanted to call it." Claimant quoted Grubbs as saying he would have to do so that night "because it was three days after my LOA was up." Claimant also recalled Grubbs saying that if she got a "doctor's note," it would "probably take care of the last three days." Claimant testified she told Grubbs she had decided not to quit.

Claimant recounted that she attempted to get a note from Kallenbach but was unable to do so because he was too busy and because he subsequently had emergency surgery.

Around July "22nd to the 24th," 1996, Claimant called Hudson and spoke to the "secretary." According to Claimant, the secretary stated Hudson "considered me quitting without notice because I did not return ... to work from my leave of absence." Claimant added that the secretary informed her that Avery (the plant manager) told Claimant's supervisor "to give me three days and if they hadn't heard from me before then

to go ahead and put me down as quitting without notice."

At the Tribunal's hearing, Claimant presented a note from Kallenbach dated September 10, 1996, addressed: "To whom it may concern." The note reads, in pertinent part:

"Susan Woodard was advised by me to terminate her employment at Hudson Foods because the work seemed to exacerbate her symptoms of anxiety and depression. I first wrote a letter to the personel [sic] officer recommending that they transfer her to a less stressful job, but apparently they had no openings. She attempted several times to return to work, but each attempt resulted in debilitating anxiety. I therefore advised her to quit that job & seek other employment...."

An entry in Kallenbach's records regarding Claimant dated the same day (September 10, 1996) reads, *inter alia:*

"Depressed. Having crying/shaking spells. Not sleeping well. Fatigued during the day. Gaining wgt. even though appetite is poor. 'Don't want to leave the house.'"

The Tribunal's decision contains comprehensive findings of fact and conclusions of law. The first conclusion of law addresses the issue of whether Claimant was discharged by Hudson or abandoned her job. The Tribunal concluded that Claimant, by absenting herself from work on and after July 16, 1996, abandoned her job. By adopting the Tribunal's decision, Commission embraced that conclusion. As we fathom Claimant's point relied on and the argument following it, she does not challenge that conclusion.

The Tribunal's second conclusion of law addresses the issue of whether Claimant's abandonment of her job was with good cause. On that issue, the Tribunal concluded:

"The claimant's work did not pose a serious threat to her physical, mental or emotional well-being. The Tribunal is not convinced that the claimant has presented competent medical evidence to show that

---

4. As we comprehend Claimant's testimony, the insurance was paying most of the cost of Claim-

ant's "therapy and everything."

her depression and anxieties were work-related. The claimant's doctor made his assessment on the claimant's interpretation of the stress level of her workplace. The employer was not treating the claimant unfairly. If workers were transferred to the employer's sanitation department while the claimant was on a leave of absence, it was appropriate since they were on the job and the claimant was not. The claimant's leaving was not with good cause attributable to the work or employer."

As we comprehend Claimant's point relied on and the argument following it, the above conclusion is the one Claimant attacks in this appeal.

In *Clevenger v. Labor and Industrial Relations Commission,* 600 S.W.2d 675 (Mo. App. W.D.1980), an employee left her job, claiming she did so because the work caused her to suffer from situational depression. Her claim for employment security benefits was denied by Commission. Affirming the decision, the court said: "[B]efore an award to [the employee] could be sustained, the appeals tribunal would have to have competent medical evidence establishing a cause and effect relationship between her work and her complained of emotional and mental condition." *Id.* at 676. The court added: "[The employee] had the burden of proof upon this issue and failed to produce any evidence that was substantial and competent on the issue of causation." *Id.*

In *Wimberly v. Labor and Industrial Relations Commission,* 688 S.W.2d 344 (Mo. banc 1985), the Supreme Court of Missouri explained that § 288.050.1(1), quoted earlier in this opinion, manifests a "legislative desire to disqualify claimants who ... left work for reasons that, while perhaps legitimate and necessary from a personal standpoint, were not causally connected to the claimant's work or employer." *Id.* at 346.[5]

In *Fifer v. Missouri Division of Employment Security,* 665 S.W.2d 81 (Mo.App. W.D. 1984), an employee became ill and was unable to work for four months. The illness was not causally connected to her job. When the employee recovered, she was informed that a replacement had been hired and no other work was available for her.

Commission denied the worker's claim for employment security benefits. On appeal, the court held:

"The precise issue posed in this case of whether or not an employee is eligible for unemployment compensation when the employee left work because of illness not having a causal relation to the job was decided in *Duffy v. Labor and Industrial Relations Commission,* 556 S.W.2d 195 (Mo.App.1977). In *Duffy,* the court noted that two prior cases had discussed the requirement that to constitute an involuntary leaving of work because of illness, a causal connection between the work and the illness must exist.... In *Duffy,* the court at page 198[5–8] held:

Personal illness of the employee unrelated to her employment will not render termination involuntary unless the illness was caused or aggravated by the work or the employer."

*Fifer,* 665 S.W.2d at 82.

In the instant case, Claimant maintains her evidence established a causal connection between her job at Hudson and the anxiety and depression from which she was suffering when she failed to return to work on July 16, 1996. Specifically, Claimant argues that Kallenbach's note to whom it may concern dated September 10, 1996, and Kallenbach's letter to Avery dated June 14, 1996, established causation.

Claimant hypothesizes that inasmuch as the Tribunal's findings of fact and conclu-

---

**5.** The employee in *Wimberly* was not allowed to return to work after a leave of absence due to pregnancy. 688 S.W.2d at 345. The Supreme Court of the United States granted certiorari to resolve a conflict between *Wimberly* and a decision by the United States Court of Appeals for the Fourth Circuit in *Brown v. Porcher,* 660 F.2d 1001 (1981), concerning the Federal Unemployment Tax Act and pregnancy discrimination. *Wimberly v. Labor and Industrial Relations Commission of Missouri,* 479 U.S. 511, 512, 107 S.Ct. 821, 822–23, 93 L.Ed.2d 909 (1987). Affirming the Supreme Court of Missouri, the Supreme Court of the United States held that under Missouri law, "... all that is relevant is that [the employee] stopped work for a reason bearing no causal connection to her work or her employer." 479 U.S. at 517, 107 S.Ct. at 825.

sions of law do not mention Kallenbach's September 10, 1996, note, the Tribunal (and therefore Commission) failed to consider it. Citing *Geiler v. Missouri Labor and Industrial Relations Commission*, 924 S.W.2d 606, 609[9] (Mo.App. E.D.1996), Claimant insists that Commission may not arbitrarily ignore relevant evidence not shown to be disbelieved or non-credible.

Hudson has filed no brief in response to Claimant's brief; however, Division has filed a brief urging affirmance of Commission's decision. Division asserts Claimant failed to satisfy her burden of proving her "illness" was causally connected to her work or Hudson.

Division points out that at the Tribunal's hearing, a record from another physician regarding Claimant was received in evidence. That record shows the physician saw Claimant in March, 1990, and February and March, 1995. On those occasions, Claimant was "having some alternating depression and mild anxiety." The record recites that after March, 1995, Claimant "had no problems for the next year with any significant anxiety or depression." The physician determined that Claimant's "panic disorder" that began in February, 1996, "is a new problem ... that is not related to the problem of March 1995." [6]

■■■ In adjudicating this appeal, we are mindful that Commission's findings of fact, if supported by competent and substantial evidence, are conclusive in the absence of fraud. § 288.210, footnote 2, *supra*; *Burns*, 845 S.W.2d at 554–55. We review the evidence in a light most favorable to the findings and decision of Commission. *Id.* at 555.

So viewed, the evidence shows Claimant suffered from depression and anxiety in 1990 and again in 1995. While the physician who treated her on those occasions concluded that her panic disorder which began in February, 1996, constituted a "new problem," it is clear that Claimant's emotional problems did not first manifest themselves after she began working for Hudson.

Additionally, as we have seen, Claimant admitted at the Tribunal's hearing that her

1996 panic attacks first occurred at home in February; they did not occur at work until March. As we understand Claimant's testimony, she worked only part of one day at Hudson after May 1, 1996; that day was May 16. Yet, Kallenbach's records show that on June 5—almost three weeks after working the partial day—Claimant was very emotionally distressed and tearful. Kallenbach's assessment of Claimant's condition was panic disorder with agoraphobia and major depression.

Furthermore, Kallenbach's records show that on September 10, 1996—almost four months after Claimant's last day on the job (and at a time when she was no longer facing the prospect of returning to it)—Claimant was still depressed and suffering from "crying/shaking spells," the same afflictions she had suffered while employed by Hudson.

We also note there was no evidence that the work Claimant was assigned to perform on the marination line was stressful in itself, or that the work Claimant would have been assigned to perform had she been transferred to the sanitation department would have been more palatable. Indeed, it appears the source of the stress Claimant attributed to her job was her fellow employees, not the tasks assigned her. In that regard, Hudson fired the employee who grabbed Claimant in late March or early April, 1996. Yet, Claimant's depression persisted.

Finally, we espy no evidence in the record that Claimant ever described to Kallenbach the details of the work she was assigned to perform on the marination line or the specific incidents of verbal abuse by her fellow employees. In those respects, the instant case is like *Reed v. Labor and Industrial Relations Commission*, 664 S.W.2d 650 (Mo.App. S.D.1984). There, a worker quit her job because of alleged harassment by her supervisor which, according to the worker, adversely affected her mental and emotional well-being. *Id.* at 652. The worker applied for employment security benefits; in support of the application, she presented affidavits from her physician and a social worker. *Id.*

---

6. The physician's record, as we read it, shows he reached this conclusion upon seeing Claimant

July 16, 1996. That was evidently the only time he saw her in 1996.

Affirming a denial of the claim, this court held:

"[T]he affidavits contained mere conclusions and statements of opinion that the [worker] suffered depression and anxiety due to alleged harassment inflicted by her supervisor. There was no evidence what the [worker] reported to the physician and social worker as harassment. There was no medical or scientific evidence establishing the cause and effect relationship between the actual conditions of employment and [the worker's] anxiety and depression. The affidavits do not constitute competent and substantial medical evidence of the necessary relationship between those conditions and the [worker's] voluntary unemployment."

*Id.* at 653[8].

As in *Reed,* the record in the instant case lacks medical or scientific evidence establishing the cause and effect relationship between the actual conditions of Claimant's employment and her anxiety and depression.

■ We hold the evidence, viewed favorably to Commission's decision, is sufficient to support Commission's finding that Claimant's depression was not caused by her work or Hudson.

■ Beyond that, however, even assuming *arguendo* that the behavior of Claimant's fellow employees toward her occasionally elevated her emotional distress, such occurrences did not constitute good cause for quitting within the meaning of § 288.050.1(1). In *Citizens Bank of Shelbyville v. Industrial Commission,* 428 S.W.2d 895 (Mo.App.1968), a bank employee quit her job, then applied for employment security benefits on the ground that her departure was for good cause in that the bank's cashier—the employee's supervisor—had an "unsociable attitude" toward her. *Id.* at 897. The evidence, as narrated in the opinion, shows the cashier's attitude toward the employee was comparable to the attitude of Claimant's fellow employees toward her (as described by her). *Id.* at 898. The court held:

"[T]he Employment Security Law was designed to avoid the menace of economic insecurity, not to make work pleasant for employees. . . . [P]etty irritations are part of everyday living and no work is conducted in an atmosphere of complete sweetness and light. . . . We cannot say that the lack of cordiality at [the employee's] job constituted external pressure so compelling that a reasonably prudent person would be justified in giving up employment. So, [the employee] did not have good cause for quitting."

*Id.* at 900–01[11].

Commission's decision is affirmed.

GARRISON, P.J., and PREWITT, J., concur.